**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-CR-153 (RBW)** |
| **v.** | : | |
| | : | |
| **DANIEL GOODWYN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT DANIEL GOODWYN'S MOTION
TO DISMISS COUNT ONE OF THE INDICTMENT FOR FAILURE TO STATE AN
OFFENSE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes defendant Daniel Goodwyn's Motion to Dismiss Count One of the Indictment for Failure to State and Offense (hereinafter, the "defendant's motion to dismiss" or "Def.'s Mot."), ECF 59. Count One charges the Daniel Goodwyn (hereinafter, "Defendant Goodwyn") with obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2. In his Motion, Defendant Goodwyn asserts that the conduct alleged in Count One—*i.e.*, his corrupt obstruction, influencing, and impeding of Congress's certification of the Electoral College vote on January 6, 2021—falls outside the scope of § 1512(c)(2), either because his conduct was not prohibited by the statute or the certification was not an "official proceeding." Defendant Goodwyn also argues that § 1512(c)(2) is unconstitutionally vague. None of these arguments is availing, as this Court has decided in other cases. *See United States v. Robertson*, No. 21-cr-34, 2022 WL 2438546, at *3-*5 (D.D.C. July 5, 2022) (Cooper, J.); *United States v. Williams*, No. 21-cr-618, 2022 WL 2237301, at *17 n.13 (D.D.C. June 22, 2022) (Berman Jackson, J.); *United States v. Fitzsimons*, No. 21-cr-158, 2022 WL 1698063, at *6-*12 (D.D.C. May 26, 2022) (Contreras, J.); *United States v. Bingert*, No. 21-cr-91, 2022 WL 1659163, at *7-*11 (D.D.C. May 25, 2022) (Lamberth, J.); *United States v.*

*McHugh*, No. 21-cr-453, 2022 WL 1302880, at *2-*13 (D.D.C. May 2, 2022) (Bates, J.); *United States v. Puma*, No. 21-cr-454, 2022 WL 823079, at *12 n.4 (D.D.C. Mar. 19, 2022) (Friedman, J.); *United States v. Grider*, No. 21-cr-22, 2022 WL 392307, at *5-*6 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.); *United States v. Nordean*, No. 21-cr-175, 2021 WL 6134595, at *6-*8 (D.D.C. Dec. 28, 2021) (Kelly, J.); *United States v. Montgomery*, No. 21-cr-46, 2021 WL 6134591, at *10-*18 (D.D.C. Dec. 28, 2021) (Moss, J.); *United States v. Mostofsky*, No. 21-cr-138, 2021 WL 6049891, at *11 (D.D.C. Dec. 21, 2021) (Boasberg, J.); *United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718, at *11-*21 (D.D.C. Dec. 20, 2021) (Mehta, J.); *United States v. Sandlin*, No. 21-cr-88, 2021 WL 5865006, at *5-*9 (D.D.C. Dec. 10, 2021) (Friedrich, J.).   Defendant Goodwyn's Motion should therefore be denied.

## FACTUAL BACKGROUND

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol at approximately 1:00 p.m. to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020.   Temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd that had gathered outside away from the Capitol building and the proceedings underway inside.

Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts. Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended

until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

Following the 2020 Presidential Election, Defendant Goodwyn made numerous statements on social media about his opposition to the election results and his plan to be in Washington, D.C. on November 7, 2020, and January 6, 2021.

On or about November 21, 2020, Defendant Goodwyn traveled to the Georgia State Capitol building in Atlanta, Georgia to protest Georgia's certification of their state vote for the 2020 Presidential election. While there, he gave an interview at the protest and stated he was "just at the million MAGA march in Washington, D.C." and drove "from San Francisco . . . across the country."  After the protest, Defendant Goodwyn posted a story to his social media account showing the Atlanta, Georgia protest with the Beatles song "Revolution" playing over the video. The words he selected to play over the video stated, "You say you want a Revolution . . . ."

On November 28, 2020, the Defendant Goodwyn posted to Twitter stating, "#FightForTrump" and "#StopTheSteal."  He also linked a GiveSendGo account where he was soliciting donations to fund his trip to Washington, D.C. on January 6, 2021.

On December 15, 2020, Defendant Goodwyn participated in a group text message discussing the 2020 election. In this group message, he shared a link to a press release by former President Donald Trump legal team titled "Trump Legal Team Statement on Safe Harbor Deadline." The Safe Harbor deadline is the deadline for the states to certify their election results. Later that day, Defendant Goodwyn wrote in the same group message, "The electoral votes will be counted on January 6th by congress, overseen by US Senate president Mike Pence."

On January 2, 2021, Defendant Goodwyn shared a news article to the group message titled, "GOP Senators, led by Cruz, to object to Electoral College Certification, demand emergency audit."

On January 6, 2021, he was among the crowd present on the restricted Capitol grounds and approached the Capitol building from the West side, traveling east.  While approaching, he utilized a bullhorn to encourage other rioters to enter the Capitol.  Defendant Goodwyn stated, "Behind me, the door is open . . . The door is open, we need you to push forward, forward . . . for this to work. Go behind me and go in.".

At approximately 3:32 p.m., Defendant Goodwyn entered the U.S. Capitol through the Senate Wing Door with a crowd of rioters.  Defendant Goodwyn was told to leave the Capitol by a police officer.  At 3:33 p.m., he then walked backout the Senate Wing doors and told officers they were "Oath breakers."

On January 6, Goodwyn sent and received a number of text messages. For example, at 3:39 p.m., he was asked "Hey where are you?" Goodwyn responded, "Capitol" and "I went inside." The other person replied, "Inside where?" Goodwyn responded, "The capitol building." When asked why he was inside, Goodwyn sent a news article about Vice President Pence and the Electoral College certification and stated, "That's what we were doing." At 4:03 p.m., Goodwyn messaged another correspondent that "Patriots rushed the Capitol."

On January 6, at 9:41 p.m., Goodwyn posted on Twitter, "They WANT a revolution. They're proving our point. They don't represent us. They hate us. [link to twitter user DrewHLive's status, now unavailable]."  On January 6, 2021 at 10:26 p.m., Goodwyn sent a message stating, "People are saying antifa dressed up and did stuff today. Not true. Today was patriots who were fed up. I know them. I saw them. I went in the Capitol. Trump supporters weren't violent. Nobody

got hurt by them. Nothing set on fire. No Nikes looted. Just a few windows broken of the Capitol building."

## PROCEDURAL HISTORY

On February 24, 2021, the grand jury returned a five-count indictment charging Defendant Goodwyn with one count of obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2 (Count One); one count of entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); one count of disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); one count of disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and one count of parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five). *See* ECF No. 6. On November 10, 2021, the grand jury returned a superseding indictment that updated the charging language of certain counts but made no other substantive changes. *See* ECF No. 34.

On September 30, 2022, Defendant Goodwyn filed his motion to dismiss. *See* ECF 59.

## LEGAL STANDARD

An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). And an indictment need not inform

a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a *full* proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here.

Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *United States v. Bailey*, 444 U.S. 394, 413, n.9 (1980) (motions for summary judgment are creatures of civil, not criminal trials); *Yakou*, 428 F.2d at 246-47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); *United States v. Oseguera Gonzalez*, No. 20-cr-40-BAH at *5, 2020 WL 6342940 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts of what the government can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016). Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination.

Thus, when ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and more specifically, the language used to charge the crimes. *United States v. Bingert*, 21-cr-91 (RCL), 2022 WL 1659163 at *3 (D.D.C. May 25, 2022) (a motion to dismiss challenges the adequacy of an indictment on its face and the relevant inquiry is whether its allegations permit a jury to find that the crimes charged were committed); *United States v. McHugh*, No. 21-cr-453 (JDB), 2022 WL 1302880 at *2 (D.D.C. May 2, 2022) (a motion to dismiss involves the Court's determination of the legal sufficiency of the indictment, not the sufficiency of the evidence); *United States v. Puma*, No. 21-cr-454 (PLF), 2020 WL 823079 at *4 (D.D.C. Mar. 19, 2022) (quoting *United States v. Sunia*, 643 F.Supp. 2d 51, 60 (D.D.C. 2009)).

## ARGUMENT

Count One of the Indictment charges Defendant Goodwyn with corruptly obstructing, influencing, or impeding an "official proceeding,"—*i.e.*, Congress's certification of the Electoral College vote on January 6, 2021 – in violation of 18 U.S.C. § 1512(c)(2). Count One states:

> On or about January 6, 2021, within the District of Columbia and elsewhere, **DANIEL GOODWYN**, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.
>
> (**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

Superseding Indictment at 1, ECF No. 34.

In 2002, Congress enacted Section 1512(c)'s prohibition on "[t]ampering with a record or otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, 807. Section 1512(c)'s prohibition applies to:

> [w]hoever corruptly--

>    (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
>    (2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.*

18 U.S.C. § 1512(c) (emphasis added).  Section 1515(a)(1), in turn, defines the phrase "official proceeding" to include "a proceeding before the Congress."  18 U.S.C. § 1515(a)(1)(B).  By the statute's plain terms, then, a person violates Section 1512(c)(2) when, acting with the requisite *mens rea*, he engages in conduct that obstructs a specific congressional proceeding, including, as here, Congress's certification of the Electoral College vote.

    Notwithstanding the plain terms of the offense, Defendant Goodwyn advances four arguments for in his motion to dismiss Count One of the indictment for failure to state an offense: (1) that Count One lacks specific facts, (2) that Count One charges Defendant Goodwyn with conduct not contemplated by 18 U.S.C. § 1512, (3) that Count One provides no specifics as to his intent, and (4) that the Electoral Count is not an official proceeding under 18 U.S.C. § 1512(c)(2). Additionally, Defendant Goodwyn advances a rule of lenity argument in his legal standard section. Defendant Goodwyn's claims lack merit.

    With respect to his challenges, more than 12 members of this Court considered, in other cases arising out of the events at the Capitol on January 6, 2021, one or more of the arguments Defendant Goodwyn raises.  *See, e.g., Bingert*, 2022 WL 1659163 at *2 n.3.  Every district judge to have reached the issue has concluded that Congress's certification of the Electoral College is an "official proceeding" within the meaning of 18 U.S.C. 1512(c)(2).  In addition, every reported court of appeals decision to have considered the scope of Section 1512(c)(2), and all but one of the judges of this Court to have considered the issue in cases involving January 6, 2021, have concluded that Section 1512(c)(2) prohibits obstruction regardless of its connection to

8

documentary or tangible evidence.  And, in any event, even if a nexus to documentary or tangible evidence were required, the allegations in the Indictment, which track the statutory language, adequately inform Defendant Goodwyn about the charge against him; nothing more is required. *See, e.g.*, *Williamson*, 903 F.3d at 130-131.

## I.     Count One of the Indictment sets forth all the elements of 1512(c)(2) and adequately puts Defendant Goodwyn on notice.

Defendant Goodwyn misunderstands the purpose of an indictment and the low bar an indictment must clear to satisfy the federal rules and Constitution. Federal Rule of Criminal Procedure 7(c)(1) states, in relevant part, "[t]he indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." As the D.C. Circuit explained in *Haldeman*, 559 F.2d 31, "[a]lthough an indictment must – in order to fulfill constitutional requirements – apprise the defendants of the essential elements of the offense with which they are charged, neither the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendants on notice as to every means by which the prosecution hopes to prove that the crime was committed." *Id.* at 124. Indeed, "the validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *Verrusio*, 762 F.3d at 13 (quoting *Debrow*, 346 U.S. at 378).

"While detailed allegations might well have been required under common-law pleading rules, . . . they surely are not contemplated by Rule 7(c)(1), which provides that an indictment 'shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007). As a mere notice pleading, an indictment is sufficient if it "contains the elements of the offense charged and fairly

informs a defendant of the charge against which he must defend." *Id.* at 108; *Haldeman*, 559 F.2d at 123 ("The validity of alleging the elements of an offense in the language of the statute is, of course, well established."). An indictment is sufficient if it "first . . . contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second . . . enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Resendiz-Ponce*, 549 U.S. at 108 (cleaned up) (quoting *Hamling*, 418 U.S. at 117). The indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007). Only in the rare case where "guilt depends so crucially upon . . . a specific identification of fact" not included in the statutory language will an indictment that restates the statute's language be insufficient. *Haldeman*, 559 F.2d at 125 (quoting *Russell v. United States*, 369 U.S. 749, 764 (1962)).

Applying these principles, courts in this District have upheld the sufficiency of indictments far less specific than Defendant Goodwyn. For example, in *United States v. Apodaca*, 275 F. Supp. 3d 123 (D.D.C. 2017), the defendants were charged with offenses under 18 U.S.C. § 924(c). The indictment provided only "general detail as to the places where the offenses were committed: namely, Mexico and the United States." *Id.* at 154. Regarding the time of the offense, the indictments alleged that the offenses had occurred over a two- and nine-year period. *Id*. Finally, the indictments "d[id] not specify a particular weapon that was possessed," or "specify whether the firearms were 'used, carried or brandished'" under the statute. *Id*. Nonetheless, the indictments in *Apodaca* were sufficient. *Id.* at 153-54.

Count One of Defendant Goodwyn's indictment states that:

On or about January 6, 2021, within the District of Columbia and elsewhere, DANIEL GOODWYN, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

ECF No. 34, at 1.

Count One of Defendant Goodwyn's indictment is more specific than that in *Apodaca*. Here, Count One alleges the offenses took place specifically in this District. ECF No. 34. Here, Count One notifies Defendant Goodwyn of the exact day on which the alleged crime occurred: January 6, 2021. *Id.* Defendant Goodwyn demands specificity not required under the Constitution, the Federal Rules, or case law.

Defendant Goodwyn's "complaint seems to result . . . from a general misunderstanding of the purpose of the indictment and, especially, from an inflated notion of what must be included therein." *Haldeman*, 559 F.2d at 124. As the D.C. Circuit concisely explained in rejecting a similar argument in *Verrusio*:

> Verrusio contends that Count Two of the indictment failed to allege an official act because it failed to say "how Mr. Verrusio was going to use his position" to help United Rentals . . . . The indictment certainly need not allege precisely how Verrusio contemplated [committing the crime]. Would he do it by himself or ask someone else to do it? Would that someone else be Colonel Mustard or Professor Plum? With a candlestick or a rope, in the library or the study? Answering those questions is not required at the indictment stage.

762 F.3d at 14–15; *see also Williamson*, 903 F.3d at 131 (affirming denial of a motion to dismiss a count charging the defendant with making a threat against a federal law enforcement officer "with intent to retaliate against such . . . officer on account of the performance of official duties," 18 U.S.C. § 115(a)(1)(B), because the "statute speaks in terms of a threat made 'on account of the

performance of official duties,' not to draw attention to a particular official duty, but instead to assure that the threat generally relates to the officer's performance of official duties rather than to a personal dispute having nothing to do with the officer's job functions").  Defendant Goodwyn's specificity argument fails.

Defendant Goodwyn's indictment tracks the statute, specifies the date of the offenses ("January 6, 2021"), and specifies their precise location ("within the District of Columbia"). *See Resendiz-Ponce*, 549 U.S. at 108 (upholding sufficiency of indictment that echoed statute while specifying time and place of the offense and identity of the threatened officer); *Williamson*, 903 F.3d at 131 (same).  Defendant Goodwyn is in no way uncertain about what conduct "allegedly constitut[es] the offense." *United States v. Hillie*, 227 F. Supp. 3d 57, 76 (D.D.C. 2017).

## II.     Section 1512(c)(2) applies to the conduct alleged in the Indictment.

Defendant Goodwyn's second argument alleges that his conduct does not fall under § 1512(c)(2) for seven reasons: (1) the purpose of § 1512(c)(2) requires a witness or evidence, (2) § 1512(c)(2) is void for vagueness because it is applied arbitrarily and unequally, (3) that § 1512(c)(2) are vague as applied because there are no set elements, (4) grammar contributes to misapplication of § 1512(c)(2) from what was intended, (5) *noscitur a sociis* and *ejusdem generis* apply and are contrary to the government's application of § 1512(c)(2), (6) the government's construction of § 1512(c)(2) creates surplusage, and (7) a review of all of § 1512 cases shows the government's interpretation of § 1512(c) is wrong. Defendant Goodwyn's hodgepodge of overlapping arguments fail because: (1) § 1512(c)'s text, structure, and history confirm that § 1512(c)(2) is not limited to document-related obstructive content, and (2) § 1512(c)(2) is not unconstitutionally vague.

### A.     Section 1512(c)'s text, structure, and history confirm that § 1512(c)(2) is not limited to document-related obstructive conduct.

Contrary to Defendant Goodwyn's assertions, Def.'s Mot. at 15-20, in § 1512(c)(2), Congress prohibited conduct that intentionally and wrongfully obstructs official proceedings. The ordinary meaning of "obstruct[], influence[], or impede[]" encompasses a range of conduct designed to frustrate an official proceeding. That conduct can include lying to a grand jury or in civil proceedings, exposing the identity of an undercover agent, or burning a building to conceal the bodies of murder victims. It also includes storming the Capitol to derail a congressional proceeding. A defendant who, acting with the necessary *mens rea*, obstructs Congress's certification of the Electoral College vote, commits a crime under Section 1512(c)(2).

**1. Section 1512(c)'s text and structure confirm that Section 1512(c)(2) is not limited to document-related or witness-related obstructive conduct.**

Defendant Goodwyn's argument that "the purpose of . . . [§] 1512(c) [r]equires a [w]itness or [e]vidence[,]" Def.'s Mot. at 15, is without merit. Section 1512(c)(2)'s plain text demonstrates that it prohibits any corrupt conduct that intentionally obstructs or impedes an official proceeding. When interpreting a statute, courts look first to the statutory language, "giving the words used their ordinary meaning." *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks omitted). If the statutory language is plain and unambiguous, this Court's "inquiry begins with the statutory text, and ends there as well." *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 631 (2018) (internal quotation marks omitted). Here, the meaning of "obstruct[], influence[], or impede[]" is controlled by the ordinary meaning of those words.

The verbs Congress selected in § 1512(c)(2) are "noncontroversial." *United States v. Montgomery*, 578 F. Supp. 3d 54, 70 (D.D.C. 2021). The words "obstruct" and "impede" naturally "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'" *Marinello v. United States*, 138

S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries).  Similarly, "influence" includes "affect[ing] the condition of" or "hav[ing] an effect on."  *Influence*, Oxford English Dictionary, *available at* http://www.oed.com.  These verbs plainly apply to obstructive conduct that otherwise might not fall within the definition of document or evidence destruction or witness tampering.  *See United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013).  When read with § 1512(c)(2)'s subject ("whoever") and object ("any official proceeding"), those verbs prohibit a defendant "from coming in the way of, blocking, or holding up the business conducted by an official body, such as a court or the Congress, when that body has formally convened for the purpose of conducting that business."  *Montgomery*, 578 F. Supp. 3d at 70.

Comparing the language in § 1512(c)(1) to that in § 1512(c)(2) confirms that the latter, unlike the former, is not a document-focused or witness-focused provision. Section 1512(c) consists of two provisions requiring Defendant Goodwyn to act "corruptly."  Both contain a string of verbs followed by one or more direct objects. Section 1512(c)(1) applies to whoever corruptly "alters, destroys, mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding."  The objects—"a record, document, or other object"—are static.  In contrast, § 1512(c)(2) applies to whoever corruptly "obstructs, influences, or impedes any official proceeding."  The object— "proceeding"—is dynamic, and the verbs that precede it are all intended to change the movement or course of that "proceeding."  They are verbs that do not apply to a fixed "record" or "document" or an inanimate "object."  The two sections are related through their connection to an official proceeding: § 1512(c)(1)'s verbs target forms of evidence tampering (*e.g.*, altering, destroying mutilating) directed at the documents, records, and objects that are used in official proceedings, while § 1512(c)(2)'s verbs take the proceeding itself as the object—thus prohibiting whatever

14

conduct blocks or interferes with that proceeding without regard to whether that conduct involved documentary or tangible evidence.

Importing into § 1512(c)(2) a nexus-to-documents-or-witnesses requirement would not only require inserting an extratextual gloss, *see Dean v. United States*, 556 U.S. 568, 572 (2009) (courts "ordinarily resist reading words or elements into a statute that do not appear on its face") (internal quotation marks omitted), it would also render the verbs in § 1512(c)(2) inapt.  The *actus reus* that the verbs in § 1512(c)(2) encompass is obstructing, influencing, and impeding.  But "[h]ow [could] anyone [] alter, destroy, mutilate or conceal an 'official proceeding' or how [could] anyone [] 'obstruct[], influence[], or impede[]' 'a record, document, or other object'?" *Montgomery*, 578 F. Supp. 3d at 75; *accord United States v. Fitzsimons*, 21-cr-158 (RC), 2022 WL 1698063, at *12 (D.D.C. May 26, 2022); *cf. Yates v. United States*, 574 U.S. 528, 551 (2015) (Alito, J., concurring) (rejecting interpretation of "tangible object" in § 1519 that would include a fish in part because of a mismatch between that potential object and the statutory verbs: "How does one make a false entry in a fish?"); *id.* at 544 (plurality opinion) ("It would be unnatural, for example, to describe a killer's act of wiping his fingerprints from a gun as 'falsifying' the murder weapon.").  Such a mismatch is even more unlikely given how readily Congress could have drafted language that supplies a nexus to documents in § 1512(c)(2).  *See Montgomery*, 578 F. Supp. 3d at 73 (Congress could have enacted a prohibition that covers anyone who "'engages in conduct that otherwise impairs the integrity or availability of evidence or testimony for use in an official proceeding'").

The resemblance between the operative verbs in Section 1512(c)(2) and those Congress enacted in two other obstruction provisions, 18 U.S.C. §§ 1503(a) and 1505, demonstrates that § 1512(c)(2) was designed to reach conduct beyond that relating to documents or witnesses.

Congress drafted the "omnibus clause" in § 1503(a), which prohibits "corruptly . . . influenc[ing], obstruct[ing], or imped[ing] . . . the due administration of justice," to serve as a "catchall provision," *United States v. Aguilar*, 515 U.S. 593, 599 (1995), that criminalizes obstructive conduct that falls outside the narrower prohibitions within § 1503(a) and neighboring provisions. *See, e.g.*, *United States v. Sussman*, 709 F.3d 155, 168-70 (3d Cir. 2013) (removing gold coins from safe-deposit box); *United States v. Frank*, 354 F.3d 910, 916-19 (8th Cir. 2004) (removing car to avoid seizure); *United States v. Lefkowitz*, 125 F.3d 608, 619-20 (8th Cir. 1997) (instructing employee to remove documents from a house); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984) (hiding a witness); *United States v. Brown*, 688 F.2d 596, 597-98 (9th Cir. 1982) (warning suspect about impending search warrant to prevent discovery of heroin). Section 1505, which prohibits "corruptly . . . influenc[ing], obstruct[ing], or imped[ing] . . . the due and proper administration of the law under which any pending proceeding is being had," has been construed to have a similar scope. *See, e.g.*, *United States v. Vastardis*, 19 F. 4th 573, 587 (3d Cir. 2021) (manipulating an oil content meter to produce an inaccurate reading during a Coast Guard inspection and making a related false statement). Like § 1512(c)(2), Sections 1503(a) and 1505 do not include "any limitation on the nature of the obstructive act other than that it must be committed 'corruptly,'" which "gives rise to 'a fair inference' that 'Congress intended [§ 1512(c)(2)] to have a [broad scope].'" *McHugh*, 2022 WL 1302880, at *10 (quoting *United States v. Garret Miller,* 1:21-CR-119 (CJN), ECF No. 72 ("*Miller*") at 114), 2022 WL 823070 (D.D.C. March 7, 2022).

Consistent with the interpretation that obstructive behavior may violate Section 1512(c)(2) even where Defendant Goodwyn does not "take[] some action with respect to a document," *Miller* at 117, or a witness, courts of appeals have upheld convictions under § 1512(c)(2) for defendants

who lied in written responses to civil interrogatory questions about past misconduct while a police officer, *Burge*, 711 F.3d at 808-09; testified falsely before a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); solicited information about a grand jury investigation from corrupt "local police officers," *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014); and burned an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (unpublished); *see also United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects before issuance or execution of search warrants), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target).

Interpreted correctly, § 1512(c)(2) applies to Defendant Goodwyn's conduct, which involved trespassing into the restricted Capitol area and encouraging others to do the same for the purpose of stopping the certification.  In so doing, Defendant Goodwyn hindered and delayed an "official proceeding" before Congress.  *See* 18 U.S.C. § 1515(a)(1)(B). Because construing § 1512(c)(2) to reach such conduct would neither "frustrate Congress's clear intention" nor "yield patent absurdity," this Court's "obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted).

### 2.  The term "otherwise" reinforces that § 1512(c)(2) covers obstructive conduct "other" than the document destruction covered in Section 1512(c)(1).

Defendant Goodwyn also argues that § 1512(c)(2) uses the term "otherwise" as a conjunctive adverb that "conjoins and modifies" § 1512(c)(1) and § 1512(c)(2).  Def.'s Mot. at 17–18.  Defendant Goodwyn's interpretation overlooks Section 1512(c)(2)'s verbs and focuses almost entirely on the term "otherwise." But that term, properly interpreted, does not support such a narrowed interpretation of § 1512(c)(2).

17

The term "otherwise" means "in another way" or "in any other way." *Otherwise*, Oxford English Dictionary, *available at* http://www.oed.com.  Consistent with its ordinary meaning, the term "otherwise" conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that § 1512(c)(1) proscribes. *Burge*, 711 F.3d at 809; *United States v. Petruk*, 781 F.3d 438, 446-47 (8th Cir. 2015) (noting that "otherwise" in Section 1512(c)(2), understood to mean "in another manner" or "differently," implies that the obstruction prohibition applies "without regard to whether the action relates to documents or records") (internal quotation marks omitted); *United States v. Ring*, 628 F.Supp.2d 195, 224 n.17 (D.D.C. 2009) (noting that § 1512(c)(2) is "plainly separate and independent of" § 1512(c)(1), and declining to read "otherwise" in § 1512(c)(2) "as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-tampering"); *see also Gooch v. United States*, 297 U.S. 124, 126-28 (1936) (characterizing "otherwise" as a "broad term" and holding that a statutory prohibition on kidnapping "'for ransom or reward or otherwise'" is not limited by the words "ransom" and "reward" to kidnappings for pecuniary benefit); *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (construing "otherwise" in 28 U.S.C. § 2466(a)(1)(C) to reach beyond the "specific examples" listed in prior subsections, thereby covering the "myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court"). That reading follows inescapably from the text of § 1512(c)'s two subsections read together: § 1512(c)(1) "describes how a defendant can violate the statute by 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing]' documents for use in an official proceeding," *Puma*, 2022 WL 823079, at *12, while "otherwise" in Section 1512(c)(2) "signals a shift in emphasis . . . from actions directed at evidence to actions directed at the official proceeding itself," *Montgomery*, 578 F. Supp. 3d at 72 (internal quotation marks omitted).

In this way, § 1512(c)(2) criminalizes the same *result* prohibited by § 1512(c)(1)—obstruction of an official proceeding—when that result is accomplished by a different means, *i.e.*, by conduct *other* than destruction of a document, record, or other object. *Cf. United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. § 1503(a), which criminalizes the result of obstructing the due administration of justice, provides specific means of accomplishing that result and then a separate catchall clause designed to capture other means). Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense involving documents or records under § 1512(c)(1). *Petruk*, 781 F.3d at 447 (quoting *Volpendesto*, 746 F.3d at 286).

Contrary to defendant's suggestion that § 1512(c)(2) is untethered to § 1512(c)(1), "otherwise" as used in § 1512(c)(2) indicates that § 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in § 1512(c)(1). Contrary to Defendant Goodwyn's contention, Def.'s Mot. at 20, 23, 26-28, that understanding of "otherwise" is fully consistent with any reasonable definition of the term and does not render the term "surplusage."

Moreover, Defendant Goodwyn's construction arguments are inconsistent with the canons of construction he indicates, Def.'s Mot. at 29–31 (identifying the canons *noscitur a sociis and ejusdem generis*), in *Begay v. United States*, 553 U.S. 137 (2008) and *Yates*, 574 U.S. 528. In considering whether driving under the influence was a "violent felony" for purposes of the Armed Career Criminal Act (ACCA)'s residual clause, which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury*," 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added), the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure

than § 1512(c)(2). *See United States v. Sandlin*, 575 F. Supp. 3d 16, 25 (D.D.C. 2021) (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in § 1512(c)(2) is "set off by both a semicolon and a line break"). Unlike in the ACCA residual clause, the "otherwise" phrase in § 1512(c)(2) "stands alone, unaccompanied by any limiting examples." *Ring*, 628 F.Supp.2d at 224 n.17. In other words, the "key feature" in § 924(e)(2)(B)(ii) at issue in *Begay*, "namely, the four example crimes," 553 U.S. at 147, is "absent" in § 1512(c)(2). *United States v. Caldwell*, 581 F. Supp. 3d 1, 24 (D.D.C. 2021), *reconsideration denied*, No. 21-CR-28 (APM), 2022 WL 203456 (D.D.C. Jan. 24, 2022). Although the Court recognized the structural difference between the ACCA residual clause and § 1512(c)(2), *see Miller* at 107–08, it offered no reason to import *Begay*'s interpretation of "otherwise" to Section 1512(c)(2)'s differently structured provision.

In fact, § 1512(c)(2) is a poor fit for application of the *ejusdem generis* canon that Defendant Goodwyn advances, Def.'s Mot. at 29–31, and that *Begay* applied to the ACCA residual clause. "Where a general term follows a list of specific terms, the rule of *ejusdem generis* limits the general term as referring only to items of the same category." *United States v. Espy*, 145 F.3d 1369, 1370–71 (D.C. Cir. 1998). In *Yates*, for example, the plurality and concurring opinions applied the *ejusdem generis* canon to interpret the word "tangible object" in 18 U.S.C. § 1519, which makes it a crime to "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence" an investigation. *See* 574 U.S. at 545-56 (plurality opinion); *id.* at 549-50 (Alito, J., concurring). But § 1512(c)'s structure differs significantly: it includes one numbered provision that prohibits evidence-tampering, followed by a semi-colon, the disjunctive "or," and then a separately numbered provision containing the separate catchall obstruction prohibition.

"The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008).  Furthermore, in the same way that the *ejusdem generis* canon does not apply to the omnibus clause in § 1503 that is "one of . . . several distinct and independent prohibitions" rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable," *Aguilar*, 515 U.S. at 615 (Scalia, J., concurring in part and dissenting in part), it has no application to § 1512(c)(2), which embodies the same structure.  *Cf. Loughrin v. United States*, 573 U.S. 351, 359 (2014) (distinguishing the mail fraud statute (18 U.S.C. § 1341), which "contains two phrases strung together in a single, unbroken sentence," from the bank fraud statute (18 U.S.C. § 1344), which comprises "two clauses" with "separate numbers, line breaks before, between, and after them, and equivalent indentation—thus placing the clauses visually on an equal footing and indicating that they have separate meanings"); *see also McHugh*, 2022 WL 1302880, at *5 (explaining that the *ejusdem generis* canon on which the *Miller* court relied is "irrelevant" because rather than the "'A, B, C, or otherwise D'" structure found in the ACCA residual clause, § 1512(c) "follows the form '(1) A, B, C, or D; or (2) otherwise E, F, or G'").

Moreover, *Begay* noted first that the "listed examples" in § 924(e)(2)(B)(ii)—burglary, arson, extortion, or crimes involving explosives—indicated that the ACCA residual clause covered only similar crimes.  *Begay*, 553 U.S. at 142.  Those examples, the majority reasoned, demonstrated that § 924(e)(2)(B)(ii) was not designed "to be all encompassing," but instead to cover only "crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves."  *Id.* at 142-43.  The majority next drew support for its conclusion from § 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in

21

lieu of a "broad proposal" that would have covered offenses involving the substantial use of physical force and described § 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples.  *Id.* at 143-44.  In the final paragraph of that section of the opinion, the majority addressed "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "*sufficient* to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' *can* (we do not say *must* . . .) refer to a crime that is similar to the listed examples in some respects but different in others."  *Id.* at 144.

The majority's "remarkably agnostic" discussion of "otherwise" in *Begay*, which explicitly noted that the word may carry a different meaning where (as here) the statutory text and context indicates otherwise, *Montgomery*, 578 F. Supp. 3d at 69-72, suggests, if anything, that "*the government's* interpretation of 'otherwise' [in Section 1512(c)(2)] is the word's more natural reading," *McHugh*, 2022 WL 1302880, at *5 n.9; *see also Caldwell*, 581 F. Supp. 3d at 24 (declining to depart from the "natural reading" of "otherwise" to mean "'in a different way or manner'" based on the discussion in *Begay*).  In short, the majority in *Begay* "placed little or no weight on the word 'otherwise' in resolving the case." *Montgomery*, 578 F. Supp. 3d at 71.

Whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s holding and the subsequent interpretation of the ACCA residual clause demonstrate the central flaw with imposing an extratextual requirement within § 1512(c)(2).  The Supreme Court held in *Begay* that Section 924(e)(2)(B)(ii) encompasses only crimes that, similar to the listed examples, involve "purposeful, 'violent,' and 'aggressive' conduct." 553 U.S. at 144-45.  But "*Begay* did not succeed in bringing clarity to the meaning of the residual clause."  *Johnson v. United States*, 576 U.S. 591, 600 (2015).  Just as the *Begay* majority "engraft[ed]" the "purposeful, violent, and aggressive conduct" requirement onto the ACCA's residual clause, 553 U.S. at 150 (Scalia, J.,

concurring in judgment) (internal quotation marks omitted), so too would Defendant Goodwyn's proposed interpretation engraft onto § 1512(c)(2) the requirement that a defendant "have taken some action with respect to a document, record, or other object" to obstruct an official proceeding. In the nearly 20 years since Congress enacted § 1512(c)(2), no reported cases have adopted that interpretation, and for good reason. That interpretation would give rise to unnecessarily complex questions about what sort of conduct qualifies as "tak[ing] some action with respect to a document" in order to obstruct an official proceeding. *Cf. United States v. Singleton*, No. 06-cr-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished) (concluding that § 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-cr-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of § 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceeding[] through his conduct in relation to a tangible object").[1] In brief, defendant's interpretation is likely to give rise to the very ambiguity it purports to avoid.

### 3. Tools of statutory interpretation do not support the *Miller* Court's narrowed interpretation.

Defendant Goodwyn asserts that Judge Nichols' decision in *Miller* "aptly observed that the government's construction of § 1512(c)(2) presumes Congress would 'hide an elephant in a mousehole.'" Def. Mot. at 30; *Miller* at 29 (citing *Whitman v. American Trucking Assns., Inc.*,

---

[1] The defendant's interpretation of § 1512(c)(2) resembles the reading given in *Singleton* and *Hutcherson*, both of which are unpublished. As noted in the main text, no other court, at least in a reported opinion, appears to have adopted the nexus-to-tangible-evidence-or-a-tangible-object standard articulated in *Singleton* and *Hutcherson*. *See United States v. De Bruhl-Daniels*, 491 F.Supp.3d 237, 250-51 (S.D. Tex. 2020) (identifying *Singleton* and *Hutcherson* as outliers from the "most popular—and increasingly prevalent—interpretation of § 1512(c)(2) [as] an unlimited prohibition on obstructive behavior that extends beyond merely tampering with tangible items"); *Ring*, 628 F.Supp.2d at 225 n.18 (disagreeing with *Singleton* and *Hutcherson* but finding that the alleged conduct at issue in that case involved "some nexus to documents"). No court of appeals has cited either case.

531 U.S. 457, 468 (2001)).  But *Miller* was wrongly decided, and § 1512(c)(2) is, therefore, "not limited by subsection (c)(1)—which refers to 'alter[ing], destroy[ing], mutilat[ing] or conceal[ing] a record, document, or other object' specifically."  *United States v. Robertson*, 2022 WL 2438546, *3 (D.D.C. July 5, 2022).  Indeed, contrary to Defendant Goodwyn's assertions and the conclusions reached in *Miller*, the tools of statutory construction *reinforce* the conclusion that § 1512(c)(2) reaches conduct that obstructs or impedes an official proceeding in a manner other than through document destruction or evidence tampering.

Section 1512 is comprised of two parts: four subsections that define criminal offenses (§§ 1512(a)–(d)), followed by six subsections that provide generally applicable definitions and clarifications (§§1512(e)–(j)).[2]  Within the first part, three subsections (§§ 1512(a)–(c)) define criminal offenses with statutory maxima of at least 20 years, *see* §§ 1512(a)(3), (b)(3), (c), while § 1512(d) carries a three-year statutory maximum, § 1512(d). Within that structure, Congress sensibly placed § 1512(c)(2) at the very end of the most serious—as measured by statutory maximum sentences—obstruction offenses, precisely where a "catchall" for obstructive conduct not covered by the more specific preceding provisions would be expected. In any event, the "mousehole" canon—to which *Miller* and Defendant Goodwyn refer—provides that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," *Whitman*, 531 U.S. at 468, but it "has no relevance" where, as here, the statute in question was written in "broad terms," *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1753 (2020).

To that point, Defendant Goodwyn's concern that a reading of § 1512(c)(2) encompassing

---

[2] Section 1512 also includes one subsection, placed at the end, that adds a conspiracy offense applicable to any of the substantive offenses set out in §§ 1512(a)–(d).  18 U.S.C. § 1512(k).

obstructive conduct unrelated to documents, evidence, or witnesses creates "a sweeping, over-lapping" statute, Def.'s Mot. at 28, is unfounded. Overlap is "not uncommon in criminal statutes," *Loughrin*, 573 U.S. at 358 n.4, and § 1512(c)(2)'s broader language effectuates its design as a backstop in the same way that a "generally phrased residual clause . . . serves as a catchall for matters not specifically contemplated." *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009). Moreover, the "mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005).

Any overlap between § 1512(c)(2) and other provisions in § 1512 has a "simple" explanation that does not warrant the Court's narrowing construction. *McHugh*, 2022 WL 1302880, at *8. When Congress enacted the "direct obstruction" provision in § 1512(c)(2), that provision necessarily included the "indirect obstruction prohibited" in the rest of § 1512. *Id.* Congress in § 1512(c)(2) therefore did not "*duplicate* pre-existing provisions . . . but instead *expanded* the statute to include additional forms of obstructive conduct, necessarily creating overlap with the section's other, narrower prohibitions." *Id.* Congress was not required to repeal those pre-existing prohibitions and rewrite § 1512 "to create a single, blanket obstruction offense" just to avoid overlap. *Id.* at *9. "Redundancies across statutes are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and the "rule[] of thumb" that statutes should be interpreted to avoid superfluity necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and means in a statute what it says there," *id.* at 253-54. In other words, § 1512(c)(2) "creates only explicable and indeed inevitable overlap rather than outright redundancy," such that the "purported superfluity" in § 1512 "simply does not justify displacing the provision's ordinary meaning." *McHugh*, 2022 WL 1302880, at *10. That is particularly so here because even a "broad interpretation of § 1512(c)(2) does not entirely subsume

numerous provisions within the chapter," and any overlap with other provisions in § 1512 is "hardly remarkable." *Sandlin*, 575 F. Supp. 3d at 27; *accord United States v. Nordean*, 579 F. Supp. 3d 28 (D.D.C. 2021).

Notably, Defendant Goodwyn's interpretation injects a more troubling type of superfluity. Construing § 1512(c)(2) to require some action with respect to a document, for example, risks rendering § 1512(c)(2) itself superfluous considering the "broad ban on evidence-spoliation" in § 1512(c)(1). *Yates*, 574 U.S. at 541 n.4 (plurality opinion) (internal quotation marks omitted); *cf. United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991) (explaining that limiting the catchall provision in § 1503(a)'s omnibus clause to obstructive acts "directed against individuals" would render the omnibus clause superfluous because "earlier, specific[] prohibitions" in § 1503(a) "pretty well exhaust such possibilities") (internal quotation marks omitted). The canon against surplusage is "strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). It is even stronger here, where it would render superfluous "other provisions in the *same enactment*"— namely, the Sarbanes-Oxley Act. *Freytag v. Comm'r*, 501 U.S. 868, 877 (1991) (emphasis added; internal quotation marks omitted). At a minimum, the canon does not militate in favor of Defendant Goodwyn's reading. *See United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013) (canon against surplusage "'merely favors that interpretation which avoids surplusage,' not the construction substituting one instance of superfluous language for another").

Finally, an interpretation of § 1512(c)(2) that imposes criminal liability only when an individual takes direct action "with respect to a document, record, or other object" to obstruct a qualifying proceeding leads to absurd results. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (rejecting interpretation of a criminal statute that would "produce results that

were not merely odd, but positively absurd").  That interpretation would appear, for example, not to encompass an individual who seeks to "obstruct[], influence[], or impede[]" a congressional proceeding by encouraging the mob with a bullhorn to enter the Capitol building "for this to work" and who later explains that the certification of the Electoral College vote was the reason he went inside the Capitol.  The statutory text does not require such a counterintuitive result.

In short, if Congress in § 1512(c)(2) endeavored to create the narrow document-focused provision that the Court envisioned, it "did a particularly poor job of drafting" because Congress would have "effectuated [its] intent in a way that is singularly susceptible to misinterpretation, as evidenced by the overwhelming majority of judges who have construed § 1512(c)(2) broadly." *McHugh*, 2022 WL 1302880, at *11.  In accordance with those judges, the Court should reject Defendant Goodwyn's atextual, narrowed interpretation.

### 4.   Legislative history does not support Defendant Goodwyn's narrow interpretation of § 1512(c)(2).

Defendant Goodwyn also contends that the history of the enactment of the Sarbanes-Oxley Act supports his narrow view of § 1512(c)(2).  Again, Defendant Goodwyn's argument fails.  As a threshold matter, because "the statutory language provides a clear answer," the construction of § 1512(c)(2) "ends there," and resort to legislative history is unnecessary.  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).  Nevertheless, the legislative history of § 1512(c)(2)— particularly when considered alongside the history of § 1512 more generally—does not support Defendant Goodwyn's interpretation of § 1512(c)(2) for two reasons.

First, § 1512(c) aimed at closing a "loophole" in § 1512: the existing prohibitions did not adequately cover a defendant's *personal* obstructive conduct *not* aimed at another person.  *See* 148 Cong. Rec. S6550 (statement of Sen. Hatch).  To close that loophole, § 1512(c)(1) criminalizes a defendant's firsthand destruction of evidence (without having to prove that

Defendant Goodwyn induced another person to destroy evidence) in relation to an official proceeding, and § 1512(c)(2) criminalizes a defendant's firsthand obstructive conduct that *otherwise* impedes or influences an official proceeding (though not necessarily through another person). *See Burge*, 711 F.3d at 809–10.  Defendant Goodwyn's limiting construction undermines Congress's efforts at loophole closing.

Second, contrary to Defendant Goodwyn's insistence, Def.'s Mot. at 2-3, 8, and 16, no substantive inference reasonably draws from the fact that the title of § 1512 does not precisely match the "broad proscription" it in fact contains, given that the Sarbanes-Oxley Act unequivocally and broadly entitled the new provisions now codified in § 1512(c), "Tampering with a record *or* otherwise impeding an official proceeding."  Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered).  Section 1512's title is more limited simply because Congress did not amend the pre-existing title when it added the two prohibitions in § 1512(c) in 2002. *Cf. Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (describing "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text").

And while the legislators who enacted § 1512(c) in the Sarbanes-Oxley Act undoubtedly had document shredding foremost in mind, "it is unlikely that Congress was concerned with only the type of document destruction at issue in the *Arthur Andersen* case." *Montgomery*, 578 F. Supp. 3d at 77 (referencing *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005)).  In other words, "there is no reason to believe that Congress intended to fix that problem only with respect to 'the availability or integrity of evidence.'"   *Id.*   In addition, if Defendant Goodwyn's narrow interpretation were correct, then certain floor statements, such as Senator Hatch's description of Section 1512(c)'s purpose to strengthen an obstruction offense "often used to prosecute document

shredding *and other forms of obstruction of justice*," 148 Cong. Rec. S6550 (emphasis added), "would be quite strange."  *McHugh*, 2022 WL 1302880, at \*12.

### 5. Even if Section 1512(c)(2) required that the obstructive act relate to documentary evidence, Defendant Goodwyn's conduct would be covered.

Neither ordinary methods of statutory construction nor the rule of lenity supports limiting § 1512(c)(2) to document-based obstructive conduct.  But even if § 1512(c)(2) were so limited, it necessarily reaches beyond the direct evidence tampering already covered by § 1512(c)(1) to include alternative ways of interfering with the consideration of documentary evidence—as happened here when Defendant Goodwyn impeded lawmakers' consideration of documents and records at the Electoral College vote certification proceeding.

At a minimum, § 1512(c)(2) covers conduct that prevents the examination of documents, records, and other nontestimonial evidence in connection with an official proceeding.  Even assuming a focus on documentary evidence, the additional conduct that it would cover beyond § 1512(c)(1) would include, for example, corruptly blocking the vehicle carrying the Electoral College vote certificates to the Capitol for congressional examination at the certification proceeding, which would not "alter[], destroy[], mutilate[], or conceal[]" that evidence under 1512(c)(1), but would plainly "obstruct[]" or "impede[]" the proceeding with respect to that evidence under § 1512(c)(2).  For similar reasons, § 1512(c)(2) would likewise cover blocking a bus carrying lawmakers to the Capitol to examine the certificates at the certification proceeding. And it just as readily covers displacing lawmakers from the House and Senate Chambers, including continuing the riot which has displaced them, where they would examine and discuss those certificates and other records.

The Electoral College vote certification is rooted in constitutional and federal statutory law that requires the creation and consideration of various documents, and that certification operates

through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections.  Had Defendant Goodwyn sought to alter or destroy any of those documents, he would have violated Section 1512(c)(1).  Here, Defendant Goodwyn allegedly sought to stop Members of Congress from reviewing those constitutionally and statutorily mandated documents at a proceeding to certify the results of the 2020 presidential election.  Therefore, even if a violation of § 1512(c)(2) covered only obstructive behavior that prevents the consideration of documents, records, or other objects at an official proceeding, Defendant Goodwyn's alleged conduct— corruptly obstructing and impeding the examination of physical or documentary evidence at a congressional proceeding—nevertheless states an offense.

**B. Section 1512(c)(2) Is Not Unconstitutionally Vague.**

Defendant Goodwyn also contends that § 1512(c)(2) is unconstitutionally vague.  Def.'s Mot. at 11 (reciting standards for vagueness), 18, 20-26 (arguing that § 1512(c)(2) is "not vague as written – but its interpretation and application against Mr. Goodwyn and January 6 defendants are novel and capricious").  As every member of this Court to have considered the issue has rejected this argument.  *See Williams*, 2022 WL 2237301, at *17 n.13.

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV.  An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595.  To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017)

30

(quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)).  To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute."  *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010).  "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'"  *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)).  A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  *United States v. Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974).  The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that Defendant Goodwyn's conduct was criminal."  *United States v. Lanier*, 520 U.S. 259, 267 (1997).

Defendant Goodwyn's inability to cite a single case in support of his "arbitrary application" argument, *see* Def.'s Mot. at 11–14, 20-23, 25-26, demonstrates that he cannot overcome the "strong presumpti[on]" that § 1512(c)(2) is constitutional.  *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963).  Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *United States v. Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly … obstruct[ing], influenc[ing], or imped[ing]"

an "official proceeding" gives rise to "no such indeterminacy." *United States v. Williams*, 553 U.S. at 306.  The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding.   While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'"  *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).   Contrary to Defendant Goodwyn's assertions, § 1512(c)(2) "not only clearly identifies the conduct it punishes; it also 'acts to shield those who engage in lawful, innocent conduct – even when done with the intent to obstruct, impede, or influence the official proceeding.'" *Id.* (quoting *Sandlin*, 575 F. Supp. 3d at 33).  It presents no vagueness concern nor invitation for arbitrary or wholly subjective application by either courts or juries.[3]

---

[3] In connection with this argument, the defendant accuses the government of, among other things, "weaponiz[ing §] 1512(c)(2)" against the defendant, Def.'s Mot. at 21, "newly inventing" the plain application of §1512(c)(2) "for January 6 defendants, *id.* at 13, and "newly creat[ing a] construct of" § 1512(c)(2), *id.* at 22.  To the extent the defendant is contending that he or other January 6 defendants are being prosecuted under § 1512 selectively, that argument is without merit.  Section 1512(c)(2)'s "text is clear and gives fair notice of the conduct it punishes, and it is not standardless enough to invite arbitrary enforcement."  *Nordean*, 579 F. Supp. 3d at 60.  And several other members of this Court have rejected direct allegations of selective prosecution.  *See, e.g.*, *United States v. Brock*, No. 21-cr-140 (JDB), 2022 WL 3910549, at *12 (D.D.C. Aug. 31, 2022); *United States v. Rhodes*, No. 22-cr-15 (APM), 2022 WL 3042200, at *5 (D.D.C. Aug. 2, 2022); *United States v. Bozell*, No. 21-cr-216 (JDB), 2022 WL 474144, at *9 (D.D.C. Feb. 16, 2022); *United States v. Judd*, No. 21-cr-40 (TNM), 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).

III.    **The Indictment Properly Charges Defendant Goodwyn and Provides Him
        Adequate Notice**

Again, Defendant Goodwyn argues the indictment does not provide him with notice of
what acts constitute violations of Count One.  An indictment is sufficient if it "first . . . contains
the elements of the offense charged and fairly informs a defendant of the charge against which he
must defend, and second . . . enables him to plead an acquittal or conviction in bar of future
prosecutions for the same offense." *Resendiz-Ponce*, 549 U.S. at 108 (cleaned up) (quoting
*Hamling*, 418 U.S. at 117).

Defendant Goodwyn argues that because the titles of the statutes in the indictment do not
include "corruptly" for Count One and "knowingly" for Counts Two through Five, Def. Mot. at
34-35, that therefore the grand jury was not properly instructed on the law. Again, Defendant
Goodwyn ignores the plain text of the indictment. The indictment states for Count One that he
"corruptly obstruct, influence, and impede an official proceeding . . . ."  ECF 34 at 1.  Defendant
Goodwyn merely speculates that the grand jury was improperly instructed on the law. "The grand
jury gets to say—without any review, oversight, or second-guessing—whether probable cause
exists to think that a person committed a crime." *Kaley v. United States*, 571 U.S. 320, 328 (2014).

Defendant Goodwyn then states that he "briefly spoke into a bullhorn" to minimize his
conduct.  However, he omits what he said to the crowd of rioters as elected officials took shelter.
Defendant Goodwyn, just steps from the broken windows the Capitol with the fire alarms ringing,
told the mob, "Behind me, the door is open . . . The door is open, *we need you to push forward,
forward . . . for this to work*. Go behind me and go in." (emphasis added).  The meaning of his
words is clear, however.  Defendant Goodwyn eliminated any doubt about what his words meant.
Minutes later, when asked why he went into the Capitol, Defendant Goodwyn responded with a

news article about Vice President Pence and the electoral college certification and stated, "That's what we were doing."

The government does not need to list the entirety of its evidence in an indictment. The government's burden is to provide the notice of the elements and "to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Resendiz-Ponce*, 549 U.S. at 108 (cleaned up) (quoting *Hamling*, 418 U.S. at 117). Defendant Goodwyn's argument fails because it ignores the law and the text of the indictment.

## IV.     The Certification of the Electoral College Vote is an Official Proceeding.

Defendant Goodwyn argues that the Electoral College certification before Congress does not constitute an "official proceeding" under 18 U.S.C. 1512(c)(2). Def.'s Mot. at 36-37. According to Defendant Goodwyn, the certification "allows for no exercise of discretion or judgment on the parts of the tellers and the President of the Senate and their roles must therefore be regarded as purely ceremonial or ministerial." *Id.* at 36 (citation omitted). Defendant Goodwyn also contends, without authority,[4] that an "official proceeding" requires "(1) a witness and (2) evidence through testimony or documents under [§] 1512." *Id.* at 37. These arguments lack merit and every member of this Court to have considered has rejected it. *See United States v. Bingert*, No. 21-cr-91, --- F. Supp. 3d ---, 2022 WL 1659163, at *4 (D.D.C. May 25, 2022) (Lamberth, J.) (citing cases).

---

[4] The defendant states that "[t]here is significant case history prior to January 6, 2021, articulating what a "proceeding" is under [§] 1512(c)(2), none of which, includes an electoral count." Def.'s Mot. at 36. The defendant, however, fails to cite a single case to that effect.

**A. The plain text of the statute establishes that the Joint Session is an "official proceeding."**

**1. Background**

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote. Two separate provisions in the Constitution mandate that the Vice President while acting as the President of Senate "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII. Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. Section 15 details the steps to be followed: the President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives." *Id.* The President of the Senate is empowered to "preserve order" during the Joint Session. 3 U.S.C. § 18. Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once." 3 U.S.C. § 17. The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16.

The obstruction statute with which Defendant Goodwyn is charged prohibits corruptly obstructing, influencing, or impeding any official proceeding. 18 U.S.C. § 1512(c)(2). An official proceeding for purposes of § 1512(c)(2) is defined as:

(A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(B) *a proceeding before the Congress*;

(C) a proceeding before a Federal Government agency which is authorized by law; or

(D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

U.S.C. § 1515(a)(1) (emphasis added).

### 2. The certification of the Electoral College vote is a proceeding before the Congress.

Simply put, the certification of the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and, therefore, an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2). That conclusion flows principally from the obstruction statute's plain text. Skipping past the text, Defendant Goodwyn argues that Congresses certification of the Electoral college is "ministerial." Def.'s Mot. at 36. As was noted in *Puma,* the logic behind this argument is "flawed." 2022 WL 823079, at *11.

Understanding what qualifies as an official proceeding "depends heavily on the meaning of the word 'proceeding'" because "official proceeding" is defined "somewhat circularly" as, among other things, a congressional "proceeding." *See United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013). The certification of the Electoral College vote constitutes a "proceeding" under any interpretation of that term. In its broadest and most "general sense," a proceeding refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *Id.* (quoting *Proceeding,* Oxford English Dictionary, *available at* http://www.oed.com). Defendant Goodwyn does not meaningfully discount that the certification of the Electoral College

vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding—and indeed an official proceeding—under that broad definition.  And there is good reason to construe "proceeding" as used in 18 U.S.C. § 1515 broadly.  Section 1515's text encompasses not only congressional proceedings, but judicial proceedings, grand jury proceedings, any legally authorized proceedings before federal government agencies, and proceedings "involving the business of insurance."  18 U.S.C. § 1515(a)(1); *see* S. Rep. No. 97-532, at 17 (1982) (noting that the "term 'official proceeding'" in the obstruction statute is "defined broadly").

But even if the "legal—rather than the lay—understanding" of proceeding governs § 1515's interpretation, *see Ermoian*, 752 F.3d at 1170, the Electoral College vote certification qualifies.  This narrower definition includes the "business conducted by a court or other official body; a hearing."  Black's Law Dictionary, "proceeding" (11th ed. 2019).  Taken with its modifier "official," the term proceeding thus "connotes some type of formal hearing."  *Ermoian*, 752 F.3d at 1170; *see United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512").  For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in § 1515 courts analyze the degree of formality involved in an investigation.  *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (internal investigation conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (internal investigation conducted by Customs and Border Patrol not an "official

proceeding" because that term *"*contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of § 1505) (emphasis added).

The formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding.  *See Perez*, 575 F.3d at 169.  Few events are as solemn and formal as a Joint Session of the Congress.  That is particularly true for the certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute.  Required by law to begin at 1 pm on the January 6 following a presidential election, the certification of the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body."   *See* Black's Law Dictionary, *supra*.  The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election.  3 U.S.C. § 15.  As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection.  *Id.*  And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall."  *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's

platform"). The Electoral College vote certification, moreover, must terminate with a decision: no recess is permitted until the "the count of electoral votes" is "completed," and the "result declared." *Id.* In short, the certification of the Electoral College vote is a "proceeding before the Congress." *See* 18 U.S.C. § 1515(a)(1)(B).

## V.      The Rule of Lenity Does Not Apply.

Defendant Goodwyn indirectly makes a rule of lenity argument in his motion when discussing the legal standard, but not in his argument. Def.'s Mot. at 11-12. This argument is without merit. Text, structure, history, and other tools of statutory interpretation unambiguously demonstrate that § 1512(c)(2) prohibits any conduct that obstructs or impedes an official proceeding, and the *mens rea* and nexus requirements ensure that the provision does not ensnare conduct that is "not inherently malign." *Arthur Andersen*, 544 U.S. at 704. Accordingly, the rule of lenity has no role to play.

"When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Bell v. United States*, 349 U.S. 81, 83 (1955). That principle underlies the "venerable rule of lenity," *United States v. R.L.C.*, 503 U.S. 291, 305 (1992) (opinion of Souter, J.), which ensures that "legislatures and not courts" define criminal activity given the "seriousness of criminal penalties" and the fact that "criminal punishment usually represents the moral condemnation of the community." *United States v. Bass*, 404 U.S. 336, 348 (1971); *see Liparota v. United States*, 471 U.S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

39

The rule of lenity does not come into play when a law merely contains some degree of ambiguity or is difficult to decipher.  The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019).  In short, some ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork.  *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted).  "Properly applied, the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'"  *Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).

Simply put, the rule of lenity is "inapplicable" here. *Puma*, 2022 WL 823079, at *26. Congress made clear in § 1512(c)(2) that it sought to protect the integrity of official proceedings— regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself.  Any such distinction between these forms of obstruction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates § 1512(c) but a defendant who threatens those conducting that proceeding escapes criminal liability under the statute.  Not only does the rule of lenity not require such an outcome, but such an application loses sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted.  *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty

always prevails over ambiguous laws.").  It would strain credulity for any defendant who was focused on stopping an official proceeding through unlawful means to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so." 18 U.S.C. § 1512(c)(2).

## **<u>CONCLUSION</u>**

For the foregoing reasons, the government respectfully requests that Defendant Goodwyn's motion to dismiss Count One be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:

*/s/ Brian Brady*
Brian Brady
Trial Attorney, Department of Justice
DC Bar No. 1674360
1301 New York Ave. N.W., Suite 800
Washington, DC 20005
(202) 834-1916
Brian.Brady@usdoj.gov