# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **Case No. 21-cr-153 (RBW)** |
| **v.** | **:** | |
| | **:** | |
| **DANIEL GOODWYN,** | **:** | |
| | **:** | |
| **Defendant** | **:** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Daniel Goodwyn to 90 days of incarceration, 36 months of supervised release, $500 in restitution, and a fine of $25,676.25, or the equivalent of the amount raised by Daniel Goodwyn relating to his criminal conduct at the time of sentencing.

## I.    Introduction

Defendant Daniel Goodwyn, 34, a self-employed journalist, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Goodwyn pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1), entering or remaining in a restricted building or grounds. As explained herein, a sentence of 90 days of incarceration, 36 months of supervised release, $500 in restitution, and a fine of $25,676.25, or the equivalent of the amount raised by Goodwyn relating to his criminal conduct at the time of sentencing is appropriate in this case because Goodwyn: (1) used a bullhorn to incite other rioters

1

to go into the United States Capitol, saying, among other things, "we need critical mass for this to work," (2) upon entry, continued into the building even after he saw a police officer reach out to him to attempt to stop him, (3) did not immediately leave, even after he acknowledged an officer's orders to leave, but  instead elected to remain and engage with another rioter, (4) minimized his conduct on January 6 in a television interview with Tucker Carlson less than two months after pleading guilty in this Court, (5) directed viewers to a fundraising website at the end of the televised interview that included links to donate to a number of January 6 defendants, with Goodwyn listed as the first among them, and (6) committed a trespass days before the events of January 6, for which he was arrested and later pleaded *nolo contendre*.

The Court must also consider that Goodwyn's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Goodwyn's crime support a sentence of 90 days of incarceration, 36 months of supervised release, and $500 restitution in this case, and a fine of $25,676.25, or the equivalent of the amount raised by Goodwyn relating to his criminal conduct at the time of sentencing.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 83 (Statement of Offense), at 1-3.

### Defendant Goodwyn's Role in the January 6, 2021 Attack on the Capitol

On January 1, 2021, Goodwyn began his trip from San Francisco, California to Washington, D.C. where he planned to call for an investigation of the 2020 presidential election

and to protest Congress's certification of the Electoral College vote. On January 6, Goodwyn attended President Trump's "Stop the Steal" rally, which took place on the Ellipse. Goodwyn then marched with other protesters to the United States Capitol.

Between 2 p.m. and 4 p.m., Goodwyn was part of the mob gathered on the Upper West Terrace of the Capitol near the Senate Wing Door entrance to the Capitol. Outside of this door, Goodwyn used a bullhorn to incite others to go into the Capitol. He yelled several inflammatory statements through the bullhorn to other rioters, including, "[b]ehind me, the door is open," "we need you to push forward, forward," "we need critical mass for this to work," and "go behind me and go in." Gov't Ex. 1. 0:00-0:24. Goodwyn then entered the Capitol himself at 3:32 p.m. Gov't Ex. 2 at 0:24.



*Figure 1. Goodwyn entering the Senate Wing Door with US Capitol Police officers in the foreground*

As Goodwyn entered, a police officer immediately attempted to make contact with him. *Id.* at 0:27. Goodwyn turned towards the officer, but he nonetheless continued into the Capitol. *Id.* at 0:28. Although the surveillance footage did not contain audio, a separate video taken on the ground showed that the officer shouted "hey!" at Goodwyn more than once. Gov't Ex. 3 at 2:48.

While walking forward, Goodwyn evasively kept his head down and slipped by several other rioters who were walking towards the exit. Gov't Ex. 2 at 0:28-0:33.

Only after Goodwyn ran directly into a line of other police officers did he look up. *Id.* at 0:34. The officers reiterated their command for Goodwyn to leave the Capitol by pointing towards the exit. *Id.* at 0:35. Goodwyn appeared to comply at first until he was stopped again by the same officer that he initially passed. *Id.* at 0:36. The officer grabbed onto Goodwyn's sweatshirt for a moment before Goodwyn dodged around the officer, away from the exit. *Id.* at 0:37-0:40. Goodwyn then stopped to talk to Anthime Gionet.[1] *Id.* at 0:45. Goodwyn paused for a moment to identify himself, but he was interrupted by an officer who told him to leave multiple times. Gov't Ex. 3 at 3:02-3:05. Goodwyn briefly turned around to leave but stopped again to speak with Gionet. Showing not only lack of respect, but contempt for police officers, Goodwyn then pointed at the officer and shouted that the officer was an "oathbreaker." *Id.* at 3:06. Goodwyn then left the Capitol at 3:33 p.m. Gov't Ex. 2 at 1:01.

Over the course of the day on January 6, Goodwyn responded to several text messages from his brother, Christopher who was checking to make sure he was okay. Goodwyn responded to the inquiries, "yes I'm safe" and "I went inside." When Christopher asked, "Inside where?", Goodwyn said, "The capitol building." After Christopher asked him why he went inside, Goodwyn then said, "That's what we were doing."

In a separate conversation, at 4:02 p.m. another individual texted Goodwyn that it seemed like Antifa was present. At 4:03 p.m., Goodwyn messaged that individual, "Patriots rushed the Capitol."

---

[1] Gionet, who goes by the pseudonym "Baked Alaska," was charged and sentenced for his involvement in the riot on January 6. 1:22-CR-00132 (TNM).

*Social Media Posts*

Goodwyn maintained a Twitter account with the username @DanielGoodwyn. On November 7, 2020, Goodwyn tweeted a picture on the account of the Proud Boys logo and stated, "Stand back and stand by! Show up at your state Capitol at noon today local time. Await orders from our Commander in Chief. #StopTheSteal! StopTheSteal.US." On December 28, 2020, Goodwyn tweeted "#FightForTrump" and "#StopTheSteal" and linked a GiveSendGo account where he solicited donations to fund his travel to Washington, D.C. on January 6, 2021.

*Goodwyn's Post-Plea Media Interview*

On March 14, 2023, less than two months after his guilty plea before this Court on January 31, 2023, Goodwyn sat for an interview with Tucker Carlson on Fox News Channel. Gov't Ex. 4. In the introduction of the interview, Carlson described Goodwyn's conduct on January 6 as only being in the Capitol for less than a minute. *Id.* at 0:00-1:10. Carlson then turned to Goodwyn and asked him, "I just want to be as fair and transparent as possible, is there anything you're leaving out? Did you commit vandalism? Did you hurt anyone?" *Id.* at 2:02-2:09. Goodwyn correctly replied that he did not hurt anyone or steal anything. *Id.* at 2:10-2:19. Goodwyn, however, conveniently left out three key facts of his conduct. He did not mention that before going inside, he used a bullhorn to incite other rioters to go into the Capitol. He did not mention that he ignored police orders to leave that were given to him immediately upon his entry. He did not mention that even after acknowledging those orders, he stayed in the Capitol to talk to with another rioter.

Carlson asked Goodwyn if there was anything the viewers could do to help January 6 defendants. *Id.* at 3:45-3:50. Goodwyn identified www.stophate.com/J6 as a website where people could donate to those defendants. This website contained a fundraiser page with an unsorted list

of January 6 defendants.[2] At the top of the page, Daniel Goodwyn was listed as the first defendant

that people could donate to. Goodwyn's fundraising page has received $25,676.25 in contributions

thus far.[3] Viewing the interview as a whole, Goodwyn minimized his conduct on January 6,

showed a complete lack of remorse, and attempted to curry sympathy with viewers to get them to

visit this website and give him money.



*Figure 2: Screenshot of the fundraiser page located at www.stophate.com*

### The Charges and Plea Agreement

On January 15, 2021, the United States charged Goodwyn by criminal complaint with

violating 18 U.S.C. § 1752(a)(1)-(2), and 40 U.S.C. § 5104(e)(2)(D) and (G). On January 29, 2021,

law enforcement officers arrested him in eastern Texas. On November 10, 2021, the United States

charged Goodwyn by a five-count Superseding Indictment with violation 18 U.S.C. §§ 1512 and

---

[2] The link to this page is https://stophate.com/shdod. This page is active as of May 18, 2023.
[3] https://donorbox.org/daniel-in-the-lions-den. Current as of May 18, 2023.

1752(a)(1)-(2), and 40 U.S.C. § 5104(e)(2)(D) and (G). On January 31, 2023, pursuant to a plea agreement, Goodwyn pleaded guilty to Count Two of the Superseding Indictment, charging him with a violation of 18 U.S.C. § 1752(a)(1). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties

Goodwyn now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Goodwyn's adjusted offense level under the Sentencing Guidelines as follows:

Base Offense Level (U.S.S.G. §2B2.3(a))                                    +4
Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A))      +2

7

|  |  |
|---|---|
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | +4 |

*See* PSR at ¶¶ 36-46.

The U.S. Probation Office calculated Goodwyn's criminal history as category I. PSR at ¶ 48. Accordingly, the U.S. Probation Office calculated Goodwyn's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 107. Goodwyn's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 90 days of incarceration, 36 months of supervised release, $500 in restitution, and a fine of $25,676.25, or the equivalent of the amount raised by Daniel Goodwyn relating to his criminal conduct at the time of sentencing..

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at \*5 (D.D.C. Dec. 28, 2021). While assessing Goodwyn's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Goodwyn, the absence of violent or destructive acts is not a mitigating factor. Had Goodwyn engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Goodwyn's case is that he incited other rioters to go inside the Capitol. He did not do so glibly. Rather, Goodwyn used a bullhorn to make sure people in the area heard him.  He made his intent to overwhelm police clear by shouting through the bullhorn that he needed enough people "to make this work." Goodwyn used the bullhorn to urge the mob of other rioters to push their way in, because he needed "critical mass." Goodwyn's shouted incitements to other rioters make clear that his objective was to impede Congress's certification of the 2020 presidential election.

Another key factor is his conduct following his plea. During his Tucker Carlson Tonight interview, less than two months after he pleaded guilty, Goodwyn opportunistically downplayed his role in urging the mob to enter the Capitol and solicited donations from the viewers. Although his statements did not rise to the level of disclaiming his plea, the interview certainly created doubt as to whether Goodwyn fully accepts responsibility for his actions on January 6. The interview also demonstrated his complete lack of remorse for his part in breaching the Capitol, inciting others to breach the Capitol, and his contempt for police on that day.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 90 days of incarceration, 36 months of supervised release, $500 in restitution, and a

fine of $25,676.25, or the equivalent of the amount raised by Daniel Goodwyn relating to his criminal conduct at the time of sentencing.

### B.  The Criminal History of Goodwyn

As the presentence report notes, Goodwyn's Criminal History Category is I with one point. PSR ¶¶ 48-49. This point stems from a *nolo contendre* plea that Goodwyn entered following a trespass charge in Wyoming. *Id.* at ¶ 48. On January 2, 2021, four days before he participated in a riot at the United States Capitol, Goodwyn refused to listen to a store manager who asked him to leave. *Id.* Police officers arrived on scene and then arrested Goodwyn after he refused to provide the police sergeant with identification. Gov't Ex 5 ¶¶ 3, 6. As part of a plea agreement, Goodwyn admitted that he committed the trespass, and the court found a factual basis for the charge. Gov't Exs. 6, 7 at p.2. The court placed the defendant on probation for a period of one year pursuant to Wyoming Statute 7-13-301 (titled "Placing person found guilty, but not convicted, on probation"). Gov't Ex. 7 at p.2. After Goodwyn completed his probation, the court dismissed the trespass charge without conviction pursuant to the same statute. Gov't Ex. 8.

This conduct, committed just days before January 6, shows that Goodwyn's criminal conduct on that date was not a one-time indiscretion, but a repeated act of unlawfulness, and thus, an indication of possible future recidivism. That conduct also shows that Goodwyn understood the nature of his criminal conduct on January 6 and the importance of complying with orders from police officers. Goodwyn, however, even with his experience with a criminal trespass days before January 6,  disregarded the blaring alarm as he entered through the Senate Wing Door, and ignored police officers' orders to leave.

In objections filed after the submission to the final presentence report, Goodwyn renewed his objection to the inclusion of his Wyoming case in the report and raised additional arguments

than those noted in his initial objections. ECF No. 102 ("Def. Obj."). Specifically, Goodwyn argues that the Probation Office and the government violated Wyoming state law, the Sentencing Guidelines, and the Tenth Amendment of the United States Constitution by treating his *nolo contendre* plea as a prior sentence under the USSG. Def. Obj. at 7. The government now responds in opposition to those objections and argues that the Wyoming case is properly counted as a prior sentence under USSG §§4A1.2(a)(1), (c)(1)(B), and (f).

To calculate a defendant's criminal history score, the USSG outline various procedures to guide the parties and the court on how to assess an individual's criminal record. USSG §4A1.1. The USSG assign a varying number of points for each prior sentence depending on the severity of the punishment associated with the sentence. USSG §4A1.1(a)-(e). A prior sentence is defined as "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere*, for conduct not part of the instant offense." USSG §4A1.2(a)(1). Certain offenses, including trespass, are generally excluded from USSG calculations. USSG §4A1.2(c)(1). However, otherwise excluded offenses may still be counted if the sentence received "was a term of probation of more than one year or a term of imprisonment of at least thirty days, or the prior offense was similar to an instant offense." USSG §4A1.2(c)(1)(A)-(B). As the government already argued in its objections to the draft PSR, the Wyoming trespass charge meets the second exception because it is similar to the trespass offense in this case. ECF Nos. 91-1, 99 at 27.

In addition to excluding certain offenses due to the nature of the offense, the USSG also exclude cases where the sentencing court disposed of the offense through diversion from the judicial process. USSG §4A1.2(f). Nonetheless, "[a] diversionary disposition resulting from . . . a plea of *nolo contendre*[] in a judicial proceeding is counted as a sentence under §4A1.1(c) even if a conviction is not formally entered." *Id.* No federal court has addressed the question of whether a

*nolo contendere* plea accepted under Wyo. St. § 7-13-301 qualifies for this exception. The only federal court to assess this statute for the purposes of subsequent adjudication concluded that the petitioner's *nolo contendere* plea qualified as a conviction under the Immigration and Nationality Act ("INA"). *Gradiz v. Gonzalez*, 490 F.3d 1206, 1207-08 (10th Cir. 2007). In reaching its conclusion, the *Gradiz* court noted that the INA definition of conviction included cases where an "adjudication of guilty has been withheld" and where the defendant "has entered a plea of guilty or *nolo contendere* or has admitted sufficient facts to warrant a finding of guilt." *Id.* (citing 8 U.S.C. § 1101(a)(48)(A)) (emphasis in original omitted). This language mimics the exception for diversionary dispositions in USSG §4A1.2(f).

Turning to the plain language of the diversionary disposition exception, Goodwyn's *nolo contendere* plea clearly is a prior sentence under the Guidelines. Indeed, the exception states that a "diversionary disposition resulting from . . . a plea of *nolo contendere*[]" is counted as a prior sentence. USSG §4A1.2(f). In response, Goodwyn's argues that he never pleaded *nolo contendere* in the Wyoming case. Def. Obj. at 6. This argument is at odds with the court records. The order suspending the proceedings against Goodwyn notes that the court found, among other things, that the "Defendant is competent to enter a plea," "[t]he plea is knowingly and voluntarily made," "Defendant's plea is made while not under the influence of alcohol or drugs," "Defendant's plea is made with an understanding of the charge," and "[t]here is a factual basis for the Defendant's plea." Gov't Ex. 7 at 1-2. The record is clear. Goodwyn pleaded *nolo contendere* to the charge of trespass in the Wyoming case.

Goodwyn next argues that, in addition to him never pleading *nolo contendere*, the Wyoming court also did not find him guilty. Def. Obj. at 7. Wyoming law and the court records belie this argument. First, the section under which Goodwyn entered his plea is titled "Placing person found

guilty, but not convicted, on probation." Wyo. St. § 7-13-301. This description indicates that *all* dispositions imposed under this section involve the court finding a defendant guilty but placing them on probation without convicting them of the crime. Goodwyn's plea documents support this conclusion. Those records indicate that the court found "a factual basis for the Defendant's plea." Gov't Ex. 7 at p. 2. As this Court is well aware, in the criminal law context, this phrase means that the court found Goodwyn guilty of the offense.

The government acknowledges that the Wyoming statute states that "[d]ischarge and dismissal under this section shall be without adjudication of guilt and is not a conviction for any purpose." Wyo. St. § 7-13-301(d). Adjudication, however, is materially distinct from making a finding. The classic example of such is when a jury finds a defendant guilty of a charge, but for a number of reasons, the court declines to enter a judgment of conviction.[4] Indeed, the title of the Wyoming statute indicates that is how the law functions. In Goodwyn's case, the court found him guilty, but did not enter a conviction against him. The Sentencing Guidelines, however, treat this disposition as a prior sentence for the purpose of calculating his criminal history score.

This application of the diversionary exception is consistent with the practice in other circuits. For example, under Massachusetts state law, a court may continue a matter without a finding of guilt after a criminal defendant admits sufficient facts for a finding of guilt. Mass. Gen. Laws c. 278, § 18 (2023); Mass. R. Crim. P. 12(a)(2). At the end of the continuance period, the court then dismisses the matter rather than entering a conviction against the defendant. Mass. Gen. Laws c. 278, § 18. The First Circuit, however, still treats such dispositions as prior sentences under the Sentencing Guidelines. *United States v. Dobovsky*, 279 F.3d 5, 7 (2002) ("When a

---

[4] Examples of such situations include when there are duplicative charges, or the court issues a judgment of acquittal under Fed. R. Crim. P. 29(b).

Massachusetts court enters a continuance without a finding . . . that continuance is considered a prior sentence for the purposes of [USSG] §4A1.1."); *see also Mackenzie v. United States*, 13-cr-10149 (FDS), 2017 WL 5502939, at *7 (D. Mass. Nov. 16, 2017) (on habeas review, noting that including the defendant's previous continuance without a finding in the Guidelines calculation "was appropriate"). Texas state law also provides for pleas like the one given by Goodwyn in Wyoming, which the Fifth Circuit treats as a prior sentence under USSG §4A1.2(f). *See United States v. Giraldo-Lara*, 919 F.2d 19, 22-23 (5th Cir. 1990) (citing a Texas state law provision that states "the court may, after receiving . . . plea of nolo contendere, hearing the evidence, and finding that it substantiates the defendant's guilt, defer further proceedings without entering an adjudication of guilt, and place the defendant on probation."). These cases indicate that it is common practice among federal courts to treat *nolo contendere* pleas as prior sentences under the Sentencing Guidelines where the state court found a basis for guilt. As the Wyoming court made such a finding in this case, Goodwyn must receive a criminal history point for the prior sentence.

Lastly, Goodwyn briefly argues that the inclusion of the Wyoming sentence in the defendant's Guidelines' calculation violates the Tenth Amendment. Def. Obj. at 2. This amendment states "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend. X. The only argument that Goodwyn makes in support of this claim is "The addition of a criminal history point violates . . . the Tenth Amendment[] and the USSG (which acknowledges the Tenth Amendment in the relevant sections." Def. Obj. at 2.  The government is not aware of any portion of the USSG that discusses the Tenth Amendment. The government infers that Goodwyn's argument is that by treating his Wyoming case as a prior sentence, the executive and judicial branches of the federal government are stepping into the shoes of the people of Wyoming

and exercising their power to convict him of the trespass. The government takes no such action. The Guidelines calculation does not and cannot go into the Wyoming court records and change the defendant's *nolo contendre* plea to a guilty plea. The Guidelines simply mandate that the Court view Goodwyn's plea as a prior sentence to determine his criminal history score.

### C.  Goodwyn's Autism Diagnosis

The presentence report notes that Goodwyn suffers from  autism, which impacts his response to certain situations, especially when he is under stress. PSR ¶ 72. Goodwyn can also have difficulty understanding "non-written" rules. PSR ¶ 73. Nonetheless, the Court should give minimal weight to this factor. When Goodwyn unlawfully entered the Capitol on January 6, he was met with a blaring alarm, Gov't Ex. 3 at 2:45, and a police officer immediately to his right, directing him to leave the Capitol, Gov't Ex. 2 at 0:27. Goodwyn's autism does not explain why he was unable to process those two stark warnings not to enter the Capitol, and to remain there after he entered. More significantly, Goodwyn's autism does not provide a mitigating reason for him inciting other rioters to go inside the building, and his statement to other rioters that they needed a critical mass for his objective of overwhelming police guarding the building to work. Insofar as the stress of the day impacted Goodwyn's thinking and actions on January 6, nothing would have prevented him from leaving the Capitol to lessen the stress. Moreover, there was no such stress when he decided to sit down for an interview two years after the fact and minimize his actions within the riot.

### D.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United*

*States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### E.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that

behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Goodwyn needs to be specifically deterred from future conduct. Goodwyn's interview on Tucker Carlson Tonight indicates that he does not take his actions, nor the impact of those actions, seriously. Rather, he views his conduct as a means to solicit money contributions for himself, much like he saw his trip to D.C. on January 6 as an opportunity to fundraise. In addition, his back-to-back refusals to leave places where he has been asked and ordered to do so demonstrates a need to deter recidivistic conduct by Goodwyn.

### F.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Goodwyn based on his own conduct and relevant characteristics, but should give substantial weight to the context of his participation in the January 6 riot.

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Goodwyn has pleaded guilty to Count Two of the Superseding Indictment, charging him with knowingly entering or remaining in a restricted building without lawful authority to do so, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. William Tyron*, 1:21-cr-420 (RBW), Tyron tried to enter the Capitol from the Memorial Doors where he was confronted by a line of police officers. When Tyron tried to enter, they used pepper spray on him and struck him with a baton. Tyron nonetheless entered the Capitol Building through a broken window. When he returned outside, he stood on a vehicle and used a microphone to "redress [his] grievances." Tyron also rallied the crowd by singing

"We're Not Gonna Take It." Tyron also spoke to a journalist on the steps of the Capitol and compared the rioters to the storming of Normandy in World War II. Like Goodwyn, in a post-arrest interview, Tyron showed no remorse, stating that January 6 "was awesome." This Court sentenced Tyron to 50 days of incarceration, 12 months of supervised release, a $1,000 fine, and $500 in restitution.

In *United States v. Marilyn Fassell*, 1:21-cr-692 (CKK), Fassell stood at the base of the staircase leading to the Upper West Terrace. While police officers still guarded the stairs, Fassell yelled to the crowd "They can't stop millions!" Fassell then continued up to the terrace when the police line broke, yelling "let's go!" and "why are we stopping? Why is anybody stopping?" to the crowd. Fassell made her way into the Senate Wing Door breach, where she went into Speaker Nancy Pelosi's office. After her arrest, Fassell spoke with a newspaper reporter, stating that she thought the charges were "a joke" and that she was let into the Capitol by a police officer. The Court sentenced Fassell to 30 days of incarceration, 36 months of supervised release, and $500 in restitution.

In *United States v. James Bonet*, 1:21-cr-121 (EGS), as he entered the Capitol Grounds, Bonet called police officers "pieces of shit" as they held back rioters on the west front. Bonet proceeded to the Upper West Terrace and entered the Senate Wing Door roughly 20 minutes before Goodwyn. On social media, Bonet stated that he went inside because he wanted to "tak[e] our country back." Once inside, he made his way to the office of Senator Jeff Merkley where he smoked a marijuana cigarette. The court sentenced Bonet to 90 days of incarceration, one year of supervised release, and $500 in restitution.

In *United States v. Jack Jesse Griffith*, 1:21-cr-204 (BAH), Griffith stood outside of the Senate Wing Door and took pictures of himself smiling with his fist in the air. After the first breach

of the Capitol occurred, Griffith screamed with excitement as he entered the Senate Wing Door. Griffith continued to take photographs of himself inside the Capitol, before leaving after approximately ten minutes inside. After he was arrested, Griffith spoke to journalists and used his new publicity to encourage people to purchase his "new Trump video game." Like Goodwyn, Griffith also created an online fundraiser for himself titled "Keep Liberty Dragon Free," and used a photograph of himself standing on the steps to the US Capitol as part of the website. Griffith also minimized his conduct, though in a private Facebook conversation, rather than on a national television show. The court sentenced Griffith to 90 days of home confinement, 36 months of probation, and $500 restitution.

In *United States v. Jacob Garcia*, 1:22-cr-118 (DLF), while standing outside of the Senate Wing Door, Garcia encouraged rioters to go into the Capitol, telling them "If you're not going, get out," "get in here," and "come on." Once inside the building, Garcia accosted police officers and directed rioters into police lines. After leaving the Capitol, Garcia showed no remorse for his actions, stating on Facebook that his only regret was "not getting some souvenirs." Unlike Goodwyn, however, Garcia had no prior criminal history and did not use a nationwide television network to fundraise on a false story. The Court sentenced Garcia to 30 days of intermittent confinement on the weekends, 24 months of probation, and $500 in restitution.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Goodwyn must pay $500 in restitution, which reflects in part

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

the role Goodwyn played in the riot on January 6.[7] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Goodwyn's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 33.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 90 days' incarceration, 36 months' supervised release, $500 restitution, a fine of $25,676.25, or the equivalent of the amount raised by Daniel Goodwyn relating to his criminal conduct at the time of sentencing. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

<div align="center" style="text-align:right">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:     s/ *Andrew Haag*
        Andrew S. Haag
        Assistant United States Attorney
        MA Bar No. 705425
        601 D Street N.W.
        Washington, D.C. 20530

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## CERTIFICATE OF SERVICE

On this 18th day of May 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

                s/ *Andrew Haag*
               Andrew S. Haag
               Assistant United States Attorney
               MA Bar No. 705425
               601 D Street N.W.
               Washington, D.C. 20530