## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:21-cr-00153 (RBW)** |
| | ) | |
| **DANIEL GOODWYN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### **DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Comes now the Defendant, Daniel Goodwyn by and through undersigned counsel, and respectfully submits this Sentencing Memorandum in order to assist the Court, when he comes before it on June 5, 2023, in imposing a sentence in this case that is, "sufficient but not greater than necessary to comply with the purposes" of 18 U.S.C. § 3553. For 18 U.S.C. § 3553 requirements, undersigned Counsel respectfully recommends that a sentence of time served, with three months of supervised release and sixty hours of community service, with no fine, and $500.00 restitution is appropriate. Mr. Goodwyn served 21 days in jail, followed by 12 months and four days of home confinement with location monitoring. As of sentencing, Mr. Goodwyn will have been under both Court-ordered supervised release and in the third party custody of a parent for twenty-seven months and eighteen days.

If the Court feels it should order further prison time after considering Mr. Goodwyn's disability and the risks posed by prison time, we request that it be no more than twelve additional days. The jail and prison time for defendants convicted of and sentenced under 18 U.S.C. Section 1752(a)(1), is shown in Exhibit 1. The average is 1.3 months, with many receiving no prison. Others' offenses included going much further in the building and staying much longer than Daniel. The exhibit shows times inside the building. And unlike Mr. Goodwyn, many spoke words, whether hyperbole or not, that had no place at the Capitol and the events, yet they received no

prison time. Others ignored police. Mr. Goodwyn was there to support the Electoral Count and left when told, with a violative delay of seconds to stop and talk to a live streamer before fully complying with the order to leave.

## I.   INTRODUCTION.

The tone herein will not match what appears to be a hostile one in the government's memorandum with a narrative designed for unfair prejudice by a new AUSA who was not part of Mr. Goodwyn's plea negotiations. Mr. Goodwyn is disabled under Autism Spectrum Disorder. Plea negotiations were very fact-based, and to allow for his disorder that requires facts with truth, eliminated language that was not representative of where Mr. Goodwyn was located or what he saw, such as referring to the crowd as "rioters" when the people around him were peaceful. Police stood yards away observing, with no intervention. The fact-based Statement of the Offense regarding Mr. Goodwyn's acts was not filled with untrue adjectives and hyperbolic descriptions about his actions as are found in the government's memorandum. Given his type of autism, where truth is an area he does not go outside of, Mr. Goodwyn would not sign on to things that were not based on facts and reality at his location. In this case, a new AUSA's effort to convey a narrative approaches infliction of emotional distress on Mr. Goodwyn given his specific Autism Spectrum Disability - with the case docket containing medical assessments presented at a hearing. We will not harbor on the government's embellishments and unfairly prejudicial language.

This memorandum instead will follow Ephesians 4:31–32, and ask for the Court's consideration where that tells us "Let all bitterness, and wrath, and anger, and clamor, and evil speaking, be put away from you, with all malice: [32] And be ye kind one to another, tenderhearted, forgiving one another, even as God for Christ's sake hath forgiven you." Mr. Goodwyn admitted guilt. His admitted offense was specific. Other accusations and context were not litigated at a trial.

Aligned with the above, Mr. Goodwyn asks that the Court put aside an unjust demand for a fine. First, the government's demand is outside the agreed upon USSG guidelines, as also captured in the Presentence Investigation Report. As importantly, he has no funds as the Presentence Investigation Report shows. The government is asking that the Court punish Mr. Goodwyn by demanding blood from a stone in the amount of $25,676.25 that is outside the guidelines. He received that amount in charity to help him in his debt for legal fees for former attorneys and this for unknown reasons is bothersome to the government. Mr. Goodwyn did not collect the funds for legal services and then use a public defender. He saved the taxpayers that cost. Mr. Goodwyn does not hold title to the funds when they are donated. When funds are sent to him from the "donor box" recipient, Mr. Goodwyn pays debt that is 100% related to January 6th. He makes payments (as shown in detail to the investigating Probation Officer) that are for debt of approximately $75,000 for "legal services" - which costs the undersigned and Mr. Goodwyn cannot begin to explain. Mr. Goodwyn will be paying approximately three times the amount he received in charity. He has no money to pay a fine.

It is unclear why the government is upset that Tucker Carlson showed the released CCTV of what Mr. Goodwyn pled guilty to for January 6th. Neither Mr. Goodwyn nor counsel own Fox News' time where discussion of the charges not pled to and dismissed could be added. Mr. Carlson wanted to help January 6th defendants and Mr. Goodwyn pointed the audience to StopHate.com where they could further inform themselves, and decide whether they wanted to pray, send mail, or donate. The government unfairly insinuates that the Defense was running the show.

This memorandum requests that the Court accept Mr. Goodwyn's sincere remorse where he admitted his failings in signing the plea agreement and statement of the offense, and that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider

every convicted person as an individual and every case as a unique study in the human failings...."

*Gall v. United States*, 552 U.S. 38, 52 (2007). Although the government without medical degree dismisses Mr. Goodwyn's Autism Spectrum Disability, we ask you to compassionately consider it, and his prior time in jail, home confinement, and under supervision. As to Mr. Goodwyn individually with his disability, "*The man who has a conscience suffers whilst acknowledging his sin. That is his punishment-- as well as prison*." Fyodor Dostoevsky, <u>Crime and Punishment</u>.

We ask your understanding that because of autism, Mr. Goodwyn does not always present the facial expressions or tone the Court may expect as reflective of remorse. Mr. Goodwyn in his sorrow for his and all persons' actions on and after January 6th — where emotional words by elected officials, before juries, and in the media continue to inflame hatred by Americans against Americans who love this country, such as using labels such as "insurrectionists" or "traitors," — further asks God that his atonement may help stop discord that has ensued since January 2021, and be dedicated to the future of all Americans and America, given Saint Francis's prayer:

> Lord, make me an instrument of Your peace,
> where there is hatred, let me sow love;
> where there is injury, pardon;
> where there is doubt, faith;
> where there is despair, hope;
> where there is darkness, light;
> where there is sadness, joy.
>
> O divine Master, grant that I may not so much seek
> to be consoled as to console,
> to be understood as to understand,
> to be loved as to love.
> For it is in giving that we receive,
> it is in pardoning that we are pardoned,
> and it is in dying that we are born to eternal life.
> Amen.

Mr. Goodwyn had no ill intent on January 6, 2021. Everyone who knows him, as shown in the support letters at EXH 2, describes him as kind, gentle, and never prone to violence. Since no

matter the sentence this Court decides there will be calls across social media that this Court should have chopped off his head, Mr. Goodwyn looks to James 3:17 and trusts that God saves our courts and blesses our judges where, "[T]he wisdom from above is first pure, then peaceable, gentle, willing to yield, full of mercy and good fruits, without a trace of partiality or hypocrisy."

## II.    LEGAL PRINCIPLES AND STANDARDS.

The U.S. Sentencing Guidelines are applied under 18 U.S.C. § 3553 where:

**(a) FACTORS TO BE CONSIDERED IN IMPOSING A SENTENCE**. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider -
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed -
  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B) to afford adequate deterrence to criminal conduct;
  (C) to protect the public from further crimes of the defendant; and
  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
...
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.
...
**(b) APPLICATION OF GUIDELINES IN IMPOSING A SENTENCE**.
(1) IN GENERAL. Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration . . . .

18 U.S.C. § 3553

The court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that *imprisonment is not an appropriate means of promoting correction and rehabilitation*.
18 U.S.C. § 3582(a) (Emphasis added).

In this case from the Presentencing report, with respect to Count Two,

> [T]he parties agreed that the base offense level is four, USSG §2B2.3(a), and two levels are added because the trespass occurred in a restricted building or ground, USSG §2B2.3(b)(1)(A)(vii), for an adjusted offense level of six. The government will recommend a two-level reduction for acceptance of responsibility; therefore, the estimated offense level will be at least four.

ECF No. 99 at 4.

## III. WHAT THE COURT MAY IMPOSE ACCORDING TO THE USSG, PLEA AGREEMENT AND THE PRESENTENCE INVESTIGATION REPORT, AND MITIGATING FACTORS GIVEN DEFENDANT'S DISABILITY.

The government requests a fine that exceeds the USSG, Plea Agreement, and Presentence Investigation Report. "In addition, the parties agree that pursuant to USSG § 5E1.2, should the Court impose a fine, at Guidelines level four, the estimated applicable fine range is $500 to $9,500. The defendant reserved the right to ask the Court not to impose any applicable fine." *Id*. at 5.

Mr. Goodwyn requests that no fine be imposed because his conduct did not warrant it, and he will be prohibited from saving money to reestablish his independent life, which is crucial. A lengthy delay will have negative impact in considering his disability and already lengthy isolation and inability to go where he considers home. Being isolated from daily interactions and remaining dependent on living in his parents' home because he will be a pauper will be counterproductive to reestablishing his previous success made in handling life's social skills as an independent adult.

According to the plea agreement and Presentence Investigation Report, Mr. Goodwyn could receive a prison sentence of 0 - 6 months,  and supervised release up to one year. Mr. Goodwyn as stated above requests a sentence of time served, with three months of supervised release, given his successful lengthy period of pretrial supervised release. The separately filed objections to the Presentence Report noted that the report omitted all the periods of compliance

with supervised release over the past twenty-seven months, and focused on one month where communications broke down about his request for accommodation to schedule meetings remotely and not in person that required he wear a mask. ECF No. 24 makes clear that disabled persons such as Daniel with Autism Spectrum Disorder are likely to have difficulty wearing a mask. This issue was previously addressed by the Court. The Court was also previously provided with a medical diagnosis of Autism Spectrum Disorder by Dr. Jurek.

IV.    **MR. GOODWYN'S CONDUCT ON JANUARY 6, 2021.**

The Statement of the Offense is the agreed upon document that captures what Mr. Goodwyn did. He pled guilty to entering the restricted Capitol building where he was inside for about 36 seconds and when ordered to leave did so, but delayed for ten seconds to talk to a live streamer who was allowed to remain in place. No embellished narrative is required. When he entered, he felt something touch him but did not know it was the police officer by the door. He turned to look and didn't see a sign of what had touched him. The Defense searched for any and all audio, and found no evidence on any audio that the officer said anything audible. Mr. Goodwyn even used audio tools to examine frequencies that could indicate whether the officer said anything audible. He isolated words from voices and frequencies to determine individual speakers and nothing from the officer came to light. He wanted to know the truth and admit to anything he did wrong. He did not hear anyone tell him to leave right when he entered the hall area. He moved quickly to an open space so he could look around, and that is when a police officer approached him, grabbed him, and told him to leave.

Mr. Goodwyn did not incite a riot, participate in a riot (that requires violence by definition), participate in or encourage any violence, cross any police lines or barriers, push or damage any barriers, or touch a police officer. Even when grabbed, he made no physical response to the officer

in return. His words "Oath breaker - get his badge number" on his way out near the door, as captured on live stream, were a socially inappropriate response based on his having been grabbed and told to leave when he saw others being allowed to stay inside. This was his autism disability on display and Counsel requests that the Court consider that as mitigating. The facts before him were incongruent. Some could stay but he was ordered out.

Mr. Goodwyn notes that he learned to not disparage police who may act uncivilly to him because he cannot know all the facts and information they are operating upon. He admits that his "oath breaker - get his badge number" outburst to someone else by the exit who was allowed to enter while he was leaving was not the socially acceptable response, even though what he said was not a threat and not illegal.

Mr. Goodwyn went inside the building thinking he could enter for the purpose of supporting the Electoral Count and objection debate process. He wanted the process to continue. He disapproves of the violence on the grounds by anyone, and prays for anyone who was injured. Mr. Goodwyn does not condone violence.

But for his naive entry, Counsel asks the Court to consider the mitigating factors of Mr. Goodwyn's disability, and lack of cues in this new environment at the US capitol. He had signals from what was previously presented as acceptable in television and on-line media (for example, people protesting inside the US Capitol, and following Senator Sinema into a rest room to protest with no mention of arrest or federal crimes when they interrupted the Senate hearing for Justice Kavanaugh). Mr. Goodwyn had no intent to enter any chamber but thought protest in halls was acceptable from what he had seen. Further, Mr. Goodwyn had been to a protest in a state where demonstrators were allowed inside the capitol.

Mr. Goodwyn like many others did not see violence on January 6th. He did not know about violence until well after he was off the grounds. He saw only peaceful people outside where he was located. People were joking. People were singing. People were praying. There was crowd noise. On the terrace, that Mr. Goodwyn reached by walking up steps where no police were near, he only saw police yards away and off to a side in a group, with some leaning against the wall opposite the open door who said nothing. He took phone video - and saw no discernible violence.

The facts Mr. Goodwyn admitted are that he used the bullhorn to ask people to go inside. His autism disability (that also falls under the old term of "Asperger's Syndrome") meant that he naively believed that everyone present at the Capitol was there with good intentions under permit to protest. The government's own video exhibit shows that nobody listened to Daniel. He wanted people to support the objection process so there could be investigation if warranted.

Daniel had been given electronic flyers of a permitted rally and thought he and everyone could be in the grounds to use legal First Amendment speech.  He did not get exposed to tear gas. No rubber bullets or flash grenades were fired anywhere near him. His call was for people to go inside and support the ongoing process. He supported election integrity and investigation as called for by objection. Investigation of facts is reasonable for his disability of being a person who is highly functioning on the Autism Spectrum. It was against the grain of his fact-based, logic processes to want any interruption of investigation. His medical assessments and all his support letters have shown he has no violent tendencies.

The government included in one of its exhibits some video of other defendants who were inside, yelling and looking menacing, and not near Mr. Goodwyn. He had no interaction with those persons.  The full video clip not provided shows those persons who had been inside for well over forty minutes being told by other protestors that they might as well leave because all of Congress

was gone and there was nobody to protest to in the building. That is the rest of the story from "Baked Alaska's" video that apparently the government omitted.

With the sensory overload of crowd sound and movement, what Mr. Goodwyn did not connect after walking in the door was that there was no security screening. He understands that now since at state capitols there was screening. He is not making excuses. He admits that there was a police cordon that was inside the hall. He admits that he was wrong in delaying departure by stopping to talk to "Baked Alaska" on his exit.

The undersigned asks that the Court consider the facts mitigating because Mr. Goodwyn relies on signals and cues. He saw an open door with people peacefully lining up to enter while others exited, and police standing not far away allowing the entry. As his sensory perceptions operated near overload, he heard noise and not anything that sounded like an alarm. If he heard a sound it was not a familiar alarm and in his short time inside, did not register as an alarm given the acoustics and crowd noise - with no violence - at his location upon entry.

Mr. Goodwyn would never had entered if given a sign while outside that he should not enter. Never having been in such a situation before, as a person with autism he had no pieces to assemble while outside that signaled that he could not be there. He does learn by experience and nothing like this will ever happen again. Mr. Goodwyn affirms that if he is filming a story, he will not become part of it.  He affirms that he will not enter anywhere illegally.

Mr. Goodwyn will always support law enforcement operating under the law.


## V.   MR. GOODWYN'S BACKGROUND.

Mr. Goodwyn grew up in a loving, Christian family. He was born overseas on a military base. His family settled in Texas. He was a good student and was not a disciplinary problem at

home or in school. His parents' letter describes some of the differences they noted about him from their other children. There was not much recognition of high functioning autism as he was growing up. He would dedicate himself to projects and logically argue in search of facts and truth. His social skills needed instruction so as to not cause others to shy away when he persevered in discussion and arguing facts logically. He has always been characterized by teachers, friends, family, and coworkers as a good person with high moral values.

Daniel enjoys skateboarding, attending church, going to concerts, and spending time on his computer working web designs and researching. He upholds Christian values in his life, and prior to arrest was involved with a church-based organization that travels to cities to help communities and encourage community members become involved with the church. He was also involved with additional ministry work from ages 18 to 21 years old. He was never a member of any gangs, and has been falsely accused by the FBI in the complaint, and falsely copied in the Presentence Report that was only supposed to use facts from the Statement of the Offense, of being a Proud Boy or having claimed to be a Proud Boy when that is untrue. In organizing events for conservative causes, he did engage some Proud Boys to augment local police security given the potential for attacks by groups that are not conservative or of peaceful Christian values. Notably, the Proud Boys' security was coordinated with police.

He lived in San Francisco prior to arrest and loves the area. Daniel began treatment and therapy for Autism Spectrum disorder in 2018. He was diagnosed as high functioning and continues therapy. He will need to continue therapy because there is no "cure" for this disability. Living independently and contributing to society are very important for his emotional and mental well-being. He has trusted friends and a support network. He will not place himself in a strange situation by himself as happened on January 6, 2021, or in Wyoming before that at a Taco Bell.

The government apparently considers a verbal communication with a Taco Bell employee (who accused Daniel as an "invitee" or "Licensee" of trespass for not wearing a mask and not leaving fast enough) as being the same as the charge of entering the US Capitol through an unauthorized door when the building was restricted for Vice President Pence's presence. Daniel is sorry he did not expend resources to litigate the Wyoming matter to prevail. There is nothing remotely similar between the two matters and the government denigrates federal law and Section 1752 here.

Daniel will also not place himself in a verbal predicament with law enforcement again. The government relates that he was arrested in Wyoming for trespass on January 2, 2021 as if to show he is a serial trespasser. The objection to the Presentence report was entered in the docket. The events were as follows: he stopped at a rest stop in Wyoming. He was driving alone. He entered a taco bell with his MAGA hat, having seen no sign that a mask was required while he stood socially distanced. An employee began demanding that he wear a mask. Given his autism where a face covering is a problem (as common in others with autism) and factual research that masks do not work (also a quote from Dr. Fauci), he argued. The employee demanded that he leave. The employee stated he was calling the police "to trespass" him. Daniel went out to his car in the parking lot to leave. Someone who had been in the store brought him food. Daniel ate in in car and was loading his navigation when a policeman arrived at his car. The policeman wanted to discuss mask wearing as a trespass offense and Daniel asked if he could see the law or what he was violating. This is not an abnormal response from someone with autism who needs to get the signal into their brain. That officer walked to the police car, but another officer approached and dragged Daniel out of his car.

Daniel had a public defender and was allowed to leave. When his case came up in July 2021, the prosecutor offered a prosecutorial deferment. Under this, the plea of nolo contendere

was never accepted by a judge - it was taken "under advisement." There was no litigation, there was no trial, and by the court paperwork submitted with the objection to the Presentence report, there is no conviction for any purposes - the charges were dropped. That is the Court's order: no conviction, all charges dropped because Mr. Goodwyn met a year's of probation period with no offenses. The USSG, as stated in the objection filing, is very clear: no prosecutorial deferment will ever be counted as a conviction. The USSG section, "Diversionary Dispositions." § 4A1.2(f) states that "Diversion from the judicial process without a finding of guilt (e.g., **deferred prosecution**) is not counted. However, if a defendant were convicted in a court proceeding, then a deferment or delayed adjudication before sentencing will count for criminal history points. Under the Erie Doctrine and recognition of states' police power, and the USSG, Mr. Goodwyn's prosecutorial deferment does not add a criminal history point.

Further, the Presentence Report added a criminal history report based upon the government's demand, and despite the USSG, with no due process to Mr. Goodwyn. Fed. R. Crim P. 32 was designed so that the parties would have the report 35 days before sentencing, where the final report is due seven days before trial and its addendum should note issues that could not be resolved in the period. Rule 32 does not exist as relayed by the probation officer who stated that DC and his supervisors directed the policy where he should not  do anything further - even though he left factual mistakes in the report and added a criminal history point without Mr. Goodwyn's due process before leaving the matter to this Court as part of the sentencing hearing. The Probation Office and the government refused discussions and any adjustment as envisioned by Rule 32. The government even stated it opposed a motion to compel discussions and correction of the report.

Mr. Goodwyn has no criminal history. The addition of one criminal history point for the bizarre Wyoming "trespass" has no effect on sentencing here, but it is a matter of principle,

especially to a man with autism who was told in Wyoming and by court order under Wyoming law that the alleged trespass may never be used as a conviction for any purpose (Court order in ECF No. 102). He never entered a nolo contendere plea that was accepted by the Wyoming court. His record plea remained not guilty before the matter was dismissed.

## VI.     CONSIDERATIONS AND FACTORS IN SENTENCING.

### A. Mr. Goodwyn's Character Shows He Does Not and Will Not Intentionally Violate the Law.

While Pretrial release Conditions are not punishment, to a person with Mr. Goodwyn's disability, home confinement and being in third party custody for twenty-seven months can come across that way. For someone with autism, every day requires inner strength, prayer, and support from a mostly remote network of wonderful people to meet the day with some sense of normalcy. The year plus of home confinement was very difficult in the isolation that Mr. Goodwyn experienced many days where he could not maintain life in his own home. Autism specialists generally do not recommend isolation. Yet he never expressed blame toward anyone else, and never glorified any law-breaking as a way of rebellion to his plight. He instead prayed and looked introspectively.

Prison is not considered a safe place for those with Autism Spectrum Disorder. The cues and signs for how to behave are not clear for those such as Daniel who need them. Even as a gentle person, he will not be able to ask questions without the danger of a guard disliking him. Prison personnel are not equipped for his disability. More incarceration will lead to Daniel not talking unless asked questions by guards, where hopefully he will understand how and when to answer. He will not be adept at reading other inmates intentions and reactions. Additionally, most studies have found that those with autism are often bullied, beaten, or harmed by the prison environment's

constant lights and noises. Although Mr. Goodwyn does not have high anxiety, studies show that anxiety and insomnia develop in those with his disability in prison. His already very decent character will receive nothing positive from further confinement.

Mr. Goodwyn is a kind person although he may come off as terse, impatient, and not socially adept as part of his disability. That does not translate to disrespect for the law, which he supports. He is not being a smart-alec when he asks questions, but that can be a misinterpreted to apply to a person with autism such as himself. For example, if he had simply talked with the officer and presented his side of the story, rather than asking for the law, the Wyoming case would be non-existent. He learned his lesson. He also learned his lesson at the U.S. Capitol where he became a part of illegal entry into the building by many protestors.

Counsel, his family, co-workers, ministers, doctors, and friends ask for your grace in considering the mitigating factors related to his autism (many in ECF No. 24) that factored into his not knowing that he could not go inside the Capitol, and not sentencing him to incarceration further than time served. He not only will never return to the US capitol as a protestor, he will as a journalist or videographer ensure he has a pass and verified permission if ever near a government building. He will never become part of the story. Prison is not needed to teach him this lesson. A long supervised release is not needed. He will have therapists and friends looking over him while he knows to add much more caution to his participation and entry to public places - including fast food restaurants like Taco Bell.

**B.  Further Prison or Home Confinement of Mr. Goodwyn will not Deter Others who Intentionally Act Criminally.**

Mr. Goodwyn has deep remorse for violating the law. He is already deterred from doing so ever again.  He has remained compliant and managed as best as he can without being able to

return to his beloved San Francisco and work helping others. His Pretrial Release Conditions already should have a deterrent effect on others.

**C.  Mr. Goodwyn Poses no Criminal or Other Threat to the Public.**

Mr. Goodwyn will continue living under Christian values as a law-abiding citizen. Prison and further isolation instead may cause a threat to his mental and physical well-being.

**D.  Prison Does Not Offer the Therapy that Mr. Goodwyn Requires**.

Federal prison does not support his disability therapy. Studies show he, like others with autism, become targets in prison populations.

**E.  Mr. Goodwyn Does Not Offer Excuses, But Asks that the Court Consider Lack of Cues and Signaling at the US Capitol Combined With His Autism Disability as Mitigating.**

Mr. Goodwyn wants to show that he can always be a law abiding citizen in the future. He will always strive to be a good Christian, where he upholds both God's and man's law. He will continue therapy and his self-improvement to ensure he does not make assumptions when cues and signals regarding where he can be, and how to respond are missing.

**F.  Avoiding Sentencing Disparities**.

The exhibit table shows that the average for all convicted of Section 1752(a)(1) is 1.3 months, where most who entered did more than enter and turn around and leave. The government asks here for one of the harsher sentences of three months in prison. The government wrongfully asks the Court to go outside the USSG and Presentence report and order three years supervised release. The facts of Mr. Goodwyn's Statement of the Offense, combined with his disability that caused him to believe he could be outside, and that he could go in the door to support the Electoral Count process make further incarceration a disparate result

compared to others similarly situated. A lengthy period of supervised release would also subject him to requiring permission to continue his self-employed work.

Mr. Goodwyn believes that in continuing his life as a good man Psalm 145:8 will always be true — The Lord is gracious, and full of compassion; Slow to anger, and of great mercy. He asks for leniency here where he may travel in his work to help others, and also grow in web design and work to stop hate.

**VII.    CONCLUSION.**

Mr. Goodwyn's disability is not an excuse, but there are mitigating factors in the missing cues and signals where he was located on January 6th.  He is remorseful. He asks the Court's and God's forgiveness for his transgressions. Counsel requests that for justice and fairness, that Mr. Goodwyn's sentence be for time served, with a three month period of supervised release, his agreed upon restitution, no fine, and sixty hours of community service so that he may continue therapy and rebuild his life.

Dated May 23, 2023                              Respectfully submitted,
                                                /s/ Carolyn A. Stewart

                                                Carolyn A. Stewart, Bar No. FL-0098
                                                Defense Attorney
                                                Stewart Country Law PA
                                                1204 Swilley Rd.
                                                Plant City, FL 33567
                                                Tel: (813) 659-5178
                                                E: Carolstewart_esq@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify on the 23nd day of May 2022, a copy of the foregoing was served upon all

parties as forwarded through the Electronic Case Filing (ECF) System.

/s/ Carolyn A. Stewart
Carolyn A. Stewart, Esq.